Lomax, J.
delivered the opinion of the Court; and considered first the case of M ’ Whirl.
This is an application for a writ of error, to a judgment of the Circuit Court of Spottsylvania, overruling a motion for a new trial, made in that Court in behalf of the prisoner, who had been convicted of murder in the second degree; and whose term of imprisonment in the penitentiary was fixed by the verdict to fifteen years. The motion was made partly because of certain'alleged irregularities in the proceedings of the Circuit Court, which, as is alleged, vacated the finding of the jury; and partly upon the merits.
The prisoner had been jointly accused with a certain William FI. Ferguson and Franklin Powell, of the murder of William Martin, on the 10th of April 1846. The accused had all of them been proceeded against jointly in the Examining Court; and sent on for further trial on the 20th of April 1846. A writ of venire facias was, thereupon, issued by the clerk of the County Court, commanding the sheriff of Spottsylvania to cause to come before the Judge of the Circuit Court, on the first day of the ensuing term, twenty-four good and lawful men, &c., “to recognize on their oaths whether the aforesaid William M Whirl, Franklin Powell and William H. Ferguson, be guilty of the murder aforesaid, or not.” At the ensuing term of the Circuit Court of Spottsylvania, a joint indictment was found against the *599 prisoners. They were, thereupon, arraigned, and upon . . , j their motion, the Court ordered that the prisoners should be tried severally, and not jointly: and the first exception of the prisoner, stated as a ground of error, is because the venire facias which was issued by the clerk of the County Court of Spottsylvania, and executed . , and returned by the sheriff according to law, for the trial of the prisoner and Franklin Powell and William PI. Ferguson, for the murder aforesaid, with which they were jointly charged, was quashed by order of the Court, and a new venire facias was awarded for the trial of the prisoner for the said offence during the same term: which was done, (as the exception alleges,) not for any defect in the first venire facias, execution or return thereof, nor on account of the absence of the veniremen, or any of them, but merely because the prisoners elected to be tried severally; and because of the change 'which the Court supposed that election should produce upon the proceedings. It appears from the returns made upon the venire facias issued by the clerk of the County Court, and that issued by the clerk of the Circuit Court, for the trial of this prisoner, that twenty-three of the men returned as veniremen on the former, were returned upon the latter. There was a change of only one individual.
The statute directing the proceedings in prosecutions against free persons, as in force prior to the act of 24th February 1846, directed that “ when the justices, (the Examining Court,) shall have determined that a prisoner ought to be tried for an offence in the Superior Court of Law, the clerk of the Court, where such examination shall be had, shall issue a venire facias, to be directed to the sheriff or sergeant, commanding him to cause twelve good and lawful men, freeholders of his county or corporation, of the neighbourhood of the place where the fact shall have been committed, to come before the Judge of the Superior Court at the time the witnesses *600 shall be bound to appear there; which writ shall be executed, &c. And the freeholders summoned by virtue thereof, or such of them as appear and be not challenged, together with so many other good and lawful men of bystanders, being freeholders within this Commonwealth, as will make the number twelve; or if the whole array be challenged, twelve of such bystanders shall be a lawful jury for the trial of the prisoner.” 1 Rev. Code, ch. 169, § 9.
The act of February 21st, 1846, enacts, that “ hereafter in all prosecutions for treasou, murder, &c. the venire facias shall command the sheriff, &c. to summon twenty-four good and lawful men, &c. who reside remote from the place where the offence is charged to have been committed,” &c.
“ At any time before arraignment or sentence, when required of the sheriff, the accused shall have a copy of the pannel of the jurors summoned for his trial. If any of the jurors summoned as aforesaid shall fail to attend, or be challenged for cause ; or if the whole array shall be challenged, the Court, before which the trial is to be had, shall cause other jurors to be summoned from the body of the county, until a pannel of twenty-four qualified jurors, free from exception, be completed: and the jury for the trial of the offence shall be composed of any twelve of the number, to be selected by lot: provided, that before the jury shall be selected, the accused shall be privileged to strike from the pannel the names of not exceeding eight of the jurors entered thereon : but he shall not be admitted to any further peremptory challenge.”
It is obvious, when the prosecution is against three prisoners charged with the same felony, that it is altogether impracticable, under the jury law of the last session of Assembly, to try them jointly, unless concessions are made by them upon the record of the Circuit Court, after the indictment and their arraignment, that *601 they will unite in their peremptory challenges which the law allows them, as to the eight members of the venire. Such concessions cannot be anticipated before they are made ; nor that the case may, by arrangement between the Commonwealth’s Attorney and the prison-J 1 ers after indictment, be placed in a condition to be tried against all the prisoners jointly. It was therefore the duty of the clerk of the Examining Court in the first instance, to have issued three writs of venire for the several trials; instead of awarding a joint writ for the trial of all the prisoners together: such joint trial not being the trial which in the regular course of proceedings would be expected ; as it would put it in the power of the prisoners, by the exercise, severally, of their peremptory challenges of eight of the veniremen, (independent of challenges for cause,) to set aside every pannel of twenty-four qualified jurors that could be returned. If we examine particularly the provisions of the general statute of 1819, regulating criminal proceedings against free persons, and of the amendment of 1846, we will discover that the Legislature has not expressly declared, if there be several parties jointly charged before the Examining Court and sent on for further trial, that the clerk of that Court shall issue a joint venire; nor has it expressly declared that he shall issue a venire for each prisoner. A direction, thus doubtful in its terms, cannot be fairly construed to repeal any provision of the common law upon the subject ; or to take away the power, which the justices of any Court whatsoever are said by the common law writers to have, when persons are indicted together, of issuing either one venire for the trial of them all together, or a venire for the trial of each of them respectively, according to the discretion of the justices. 1 Chit. Cr. L. 509. Nor can it be fairly construed, so that that discretion of the Court, according to the expediency or necessity of the case after indictment, arraignment, plead *602 ings and issues, should be forestalled by a mere ministerial act of the clerk of the Examining Court; whose judgment is little more than a solemn form of commitment for trial. The contemplation of the Legislature seems rather to have regarded the accused as a single individual; and to have made no discrimination where more than one person was accused jointly for the same offence. So that, looking to that which has been expressed by the Legislature, or that as to which it has been silent, it cannot be pronounced, that there would be any irregularity in still awarding several writs of venire facias, in cases where the common law practice would have required them to be several.
But when the prisoners, upon their own motions, obtained a severance of their trials, surely there could be no ground left for any of them to complain, that the venire that had been issued for the purpose of trying them all jointly, should be quashed, when, at their own instance, that purpose had been frustrated. Nor was there any ground left them to complain, that, in the place of the writ which had been quashed, other writs of venire should be awarded, adapted to the several trials that they themselves had prayed for. The prayer for several trials would seem to embrace in it an entire severalty of all the proceedings ; making the indictment several, the pleadings several, and the jury process and whatever was incidental or concomitant to the trial of each, several. The pretension, if admitted, that the same jury which had been originally summoned for the joint trial of all the prisoners, should continue to constitute the pannel of veniremen for each successive trial, would only tend to produce the delay of waiting in the subsequent trials, till the jurors were discharged from the first; or of issuing at some subsequent period of the term, a venire, in order to obtain jurors who had formed no preconceived opinions of the guilt or innocence of the accused ; or tend to prevent fair and impartial trials *603 of the prisoners who were subsequently tried, by having on their pannels the same jurors who had been serving or attending on the previous trials : if such a thing at this day could be at all allowed.
In order to avoid the inconveniences of several challenges, exhausting the whole pannel of a joint venire; and in order to avoid any possible delay, and in order to secure fair and impartial trials, it seems indispensable, that the recommendation of Lord Hale, under the English practice, should have been adopted, of making several writs of venire facias at once. 2 Hale 263. 1 Chit. Cr. L. 509-10. And when such writs were issued, then, according to their broad commandment, in the forms prescribed, they were the sheriff’s warrants, not for summoning exclusively the original veniremen, but for summoning whomsoever he might think most fit to perform, in the fairest and most impartial manner, the duty of passing between the Commonwealth and the prisoners, respectively.
The Court is therefore unanimously of opinion, that there is no ground for setting aside the verdict in question, because the original venire facias was quashed by the Circuit Court, and several writs of venire facias awarded by it anew.
The second ground upon which the verdict is sought to be vacated and a new trial is asked for, is, because the clerk in charging the jury, did not charge them with involuntary manslaughter, as one of the crimes of homicide.
The form in which the jury were charged by the clerk, in the present case, is the form which has been practised in trials for homicide throughout the Commonwealth for half a century; ever since the adoption of the penitentiary system. This Court can feel no inclination, after the sanction of such long continued and universal practice, to set aside a verdict, at this day, because of the alleged irregularity of this clerical omis *604 sion. The omission of involuntary manslaughter in the form, of the charge, has, doubtless, arisen from the construction, put upon the 9th section of ch. 171, 1 Rev. ,Co. page 618, that the crime of involuntary manslaughter ^as’ ky that section, been reduced from felony to misdemeanor. This was the construction put upon it ky jU(jge Tucker, soon after the passage of the law. See 4 Tuck. Com. 192-3. This clause of our statute was transcribed from the statute of Pennsylvania ; and it: has there been decided, that involuntary manslaughter must be prosecuted and punished only as a misdemeanor-; and that one, who is indicted for murder, cannot be convicted of involuntary manslaughter: because of the well settled principle that one cannot be convicted of a misdemeanor on an indictment for murder. The evidence disclosing a case of involuntary manslaughter, the defendant ought to be acquitted ; but may afterwards be indicted for a misdemeanor. Com. v. Gable, 7 Serg. & Rawle 423.
The Court is unanimously of opinion, therefore, that this second ground of objection to the verdict of the jury must be overruled.
The third exception, (which is the first upon the merits,) to the judgment of the Circuit Court overruling the motion for a new trial, is, that the verdict was contrary to law and evidence; and this presents for consideration, whether the homicide in question was murder or manslaughter.
Murder is the unlawful killing of any person with malice aforethought : and malice is either express; as where one person kills another with a sedate, deliberate mind, and formed design; such formed design being evidenced by external circumstances, discovering the inward intention; as by lying in wait, antecedent menaces, former grudges, and concerted schemes. 4 BI. Com. 198. And so, where, upon a sudden provocation, one beats another in a cruel and unusual manner, so that *605 he dies, though he did not intend his death, yet he is guilty of murder by express malice: that is, by an express evil design, the genuine sense of malitia. Id. 199. Or malice is implied by law from any deliberate, act, committed by one person against another, however sudden: as where a man kills another suddenly, without any, or without a considerable provocation, the law implies malice : for no person, unless of abandoned heart, would be guilty of such an act upon a slight, or no apparent cause. 1 Russ. Cr. L. 421-2; 4 Bl. Com. 200-1.
Manslaughter is the unlawful killing of another, without malice either express or implied; which may be, either voluntarily, upon a sudden heat, or involuntarily in the commission of some unlawful act. 4 Bl. Com. 191. The difference between the crimes of murder and manslaughter, consists in this, that manslaughter, (where voluntary,) arises from the sudden heat of the passions, murder from the wickedness of the heart. Malice aforethought is the grand criterion which distinguishes murder from other killings. 4 Bl. Com. 198. All homicide, is in presumption of law, malicious; and of course amounts to murder, unless justified, excused or alleviated; and it is incumbent upon the prisoner to make out, to the satisfaction of the Court and jury, the circumstances of justification, excuse and alleviation. 4 Bl. Com. 201; Honeyman's Case, Add. 148; Bell's Case, Id. 162; M'Fall’s Case, Id. 257; Lewis' Case, Id. 282. This presumption of malice, which makes the homicide to be murder, may be repelled by the accused, where the act, though intentional of death, or great bodily harm, was not the result of a cool, deliberate judgment, and previous malignity of heart; but is imputable to human infirmity alone, when death ensues from sudden transport of passion or heat of blood, if upon reasonable provocation, and without malice: for on such proofs, the homicide will be manslaughter. 1 *606 East’s Cr. L. 232. Nevertheless, whilst the law makes allowances for the provocation, if reasonable, yet if the provocation be not such, or if the blood has had reasonable time or opportunity to cool, or if there be evidence express malice, it will be murder. Fost. Cr. L. 296. In no instance, it has been observed, can the party jjjjjjjjg al]eviate his case by referring to a previous provocation, if it appear by any means that he acted upon express maliee. 1 East’s Cr. L. 232. In the case of .the most grievous provocation to which a man can be exposed, that of finding another in the act of adultery .with the wife of the slayer, though it would be but manslaughter if he should kill the adulterer in the first transport of passion, yet if he kill him deliberately and upon revenge, after the fact and sufficient cooling time, it would undoubtedly be murder. 1 East’s Cr. L. 234, 251; Fost. Cr. L. 296. For let it be observed, (says Foster,) that in all possible cases, deliberate liomicide, upon a principle of revenge, is murder. No man under the protection of the law, is to be the avenger of his own wrongs. If they be of a nature for which the laws of society will give him an adequate remedy, thither he ought to resort: but be they of what -nature soever, he ought to bear his lot with patience, and remember that vengeance belongs to the Most High. And, with respect to the interval of time which shall be allowed for passion to subside, it has been observed, that it is much more easy to lay down rules for determining what cases are without the limits, than how far exactly .those limits extend, 1 East’s Cr, L. 251. In cases of this kind, the immediate object of enquiry is, whether the suspension of reason arising from sudden passion, ■continued from the time of provocation received to the very instant of the mortal stroke given : for if from any circumstances whatever, it appear, that the party reflected, deliberated, or cooled any time before the fatal stroke given ; or if in legal presumption, there was time or op *607 portunity for cooling, the killing will amount to murder ; as being attributable to malice and revenge, rather than to human frailty. Oneby’s Case, 2 Ld. Raym. R. 1489; 1 Russ. Or. L. 442-3 ; Fisher’s Case, 34 Eng. G. L. R. 345.
Again, the law, in connection with the provocation, will take into consideration also the nature, the manner, the means of the retaliation for the provocation which has been given. 1 East’s Cr. L. 234. And in this connexion, if the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner or continuance of it, and beyond all proportion to the offence, it is rather to be considered as the effect of a brutal, diabolical malignity, than of human frailty. It is one of the true symptoms of what the law denominates malice; and, therefore, the crime will amount to murder, notwithstanding such provocation. Barbarity, Lord Holt has said, will often make malice.
The foregoing principles seem decisive of the character of the homicide in question; and plainly to rank it in the class of murder, and not of manslaughter.
The alleged provocation is, that the deceased had whipped the prisoner’s son, travelling inoffensively, in his father’s business, upon the turnpike road. The case of Rowley, variously stated in 12 Rep. 87; 1 Hale 453 ; Fost. 294; Cro. Jac. 296; Godb. 182; see 1 East’s Cr. L. 237-8, is strong to shew, that the provocation of a father for violence done to his son will be sufficient to repel the presumption of malice, if the father, in the first impulse of feelings immediately on hearing of the injury, should kill the person who had beaten the son: provided, however, that the retaliation was not accompanied with brutal violence; and an intent was manifested to inflict moderate chastisement upon the offender.
In the case under consideration, the alleged cause of provocation, the whipping of the prisoner’s son, took place the evening before; some twenty-four hours be *608 fore the fatal beating of the deceased by the prisoner. _ . . . J r information of this whipping was communicated soon a^ter ^ happened, by the son to the father, about sun- , down or dusk of the same day. This information the prisoner received, as it seems, without manifesting any violent transports of passion, the “furor brevis” which is spoken of in the books. The prisoner slept a night upon this provocation. He next morning resumed his work about getting timber for building Magee's house. He discoursed about his son’s injuries, expressing his desire to have “recompense.” Having finished his labours for the day, he was returning home in the evening, in company with Magee, Ferguson, Poioell and Bowling. When on his way out of the woods, where he had been working, he reached the turnpike road, the deceased was seen approaching, driving his wagon along the same road; and he was pointed out to the prisoner as the person who had whipped his son. There seems, then, to have been some deliberation between the prisoner and others of his party, about sending for the son. The prisoner, leaving at that time the deceased behind him, proceeded with Ferguson to the prisoner’s house, which was a half mile further up the road; and situated on a hill, which they had to ascend. The deceased followed on, driving his wagon, and stopped at a branch, with the other wagons in company, to water his team. He then drove along up the hill, preceded by Powell’s wagon, which was driven by Magee; and when he arrived opposite the prisoner’s house, Powell stopped his own wagon, and that also which was driven by the deceased ; or rather by the brother of the deceased; for the deceased was walking by the side of the wagon. The son, as it seems, not being at home, his presence for the purpose of identifying the deceased as the person who had whipped him, was dispensed with ; and Powell, thereupon, proceeded to make the investigation by,which this identity could be ascertained. Having *609 asked the deceased if he was the person who had whipped the boy, he was answered by a faint denial, and contrite apology. When it had been ascertained, at least to the satisfaction of the prisoners, that the deceased was the person, this prisoner was prompted by Ferguson to “ give it to him.” Thereupon, this prisoner advanced up to the deceased, challenging him to a fight, and threatening him with a whipping any how. He attacked him with his fists, and knocked him to the ground. In that condition, he continued, for a space as it would seem of five minutes, to beat with his fists and stamp with his feet, the prostrate, unresisting, supplicant, begging his assailant to desist, and invoking the Lord. He broke the nose, and inflicted on the face, the neck, the head, the chest, the belly, and even the privates of the deceased, injuries and bruises, exhibiting the marks of the most outrageous violence. At the call of some of the party present to stop, the prisoner then desisted from further violence: but threatened to renew the attack, when the deceased complained that he had been beaten for nothing. That night the deceased died in consequence of the injuries received by him from this beating.
Admitting the full force of the provocation given to the father by the beating of his son, had there been no eooling time during the repose of the night ? Was there no opportunity during the labours and occupations of the following day, for reason to resume her sway in allaying his paternal resentment? If the law could protract its indulgence for the frailties of human temper, notwithstanding these intervening opportunities of cooling, it would seem impossible to say when that state of the feelings, amounting to revenge or other malevolence, which is indicative of express malice, shall begin.
If the provocation in the first impulse of feeling in detecting an adulterer with the slayer’s wife, will repel *610 the presumption of malice, that provocation becomes itself express malice and forethought, if the first impulse of feeling has had time and opportunity to subside. Fost. 296; 1 East’s P. C. 234-251. If, however, in case’ we are t0 ^ate Provocat'on! as the counsel insisted, not from the whipping of the son and the time that whipping came to the knowledge of the father, but even from the time that the deceased first came in view of the prisoner, it does not appear that he was kindled at the sight of the deceased, into any extraordinary manifestation of passion. If any great excitement had inflamed him, was there not ample cooling time allowed him, during his walk of half a. mile, tardily ascending a hill for a considerable portion of the distance, and whilst the deceased was watering his team at the branch. We need not advert, moreover, to the circumstances of deliberation, if not of contrivance, which gathered around the closing scene of these transactions.
It was strongly contended, that chastisement and not death of the deceased was clearly intended. Malice aforethought - may consist in the intention to do great bodily harm, as well as to kill: and whether the intention be the one or the other, and death happen, the law will not surrender its general presumption, that the homicide is murder. No one can review these transactions without seeing most clearly that great bodily harm at least was intended to be perpetrated upon the deceased.
Much stress was also laid upon the circumstance that the prisoner might have resorted to deadly weapons which were at hand, if he had designed any fatal injury to the deceased; and that instead of employing these, he had only availed himself of the weapons which nature had furnished him with. And it was moreover insisted, that no case had been found deciding the homicide to be murder, when, under such circumstances, the fatal attack had been made only with the fists, and the death of the party beaten was not immediately pro *611 duced under the infliction of the violence ; but followed some time afterwards. The fists may not, indeed, be regarded generally, as a deadly weapon; but they become most deadly, by blows often repeated, long continued, and applied to vital and delicate parts of the body of a defenceless, unresisting man, on the ground, And if to the injury they are capable of producing, when wielded by a strong man, you add all the accompanying injuries which the more powerful agency of stamping the party on the ground may inflict, there might be strong ground to infer the intention not merely to cause great bodily harm, but even death itself. Without dwelling particularly upon the circumstances, and the degree of the violence under which the deceased suffered, it cannot be regarded otherwise than as excessive, cruel, greatly exceeding the widest boundaries of mere chastisement, outrageous in its nature, as well in the manner as the continuance of it, and beyond all provocation to the offence. And we may apply to it with great propriety, the saying quoted above of Lord Holt, “that barbarity will often make malice.” We cannot say, therefore, that the circumstance, that there was no use of any extraneous weapons, repels in this case the legal presumption of malice, or the legal presumption that this homicide was murder. We are not warranted to pronounce such a judgment in the face of a statute which makes “ wilful, malicious and excessive beating,” by whatever mode of beating, one of the enumerated -modes of perpetrating murder in tho first degree: and, therefore, this Court is unanimous that the homicide in question was murder, and not manslaughter. Moreover, the jury, who have convicted the prisoner, were the proper tribunal to weigh the facts and circumstances, as well as the testimony in the case. And in conformity with the principles in regard to granting new trials, settled in M’Cune’s Case, 2 Rob. R. 771, and Hill’s Case, 2 Gratt. 232, this Court cannot, even if this Court had differed from the finding of the jury, under *612 take to set the verdict aside, because the jury decided against the evidence or without evidence.
The.fourth ground of exception taken hy the prisoner, (which is the second upon the merits,) is that the pun^s^ment found by the jury is excessive,
No question has been raised by the counsel as to the degree of the murder which the prisoner has perpetrated. Nor does the Court consider that as a question propounded in this case for their adjudication. It is to be distinctly understood, that no opinion whatever as to the degree of the murder, is to he supposed as intimated in the present judgment. The degree of punishment, in prosecutions like the present, the Legislature has thought proper to entrust to the jury, as a peculiar province belonging to them, and not to the Court. At the same time the Legislature has affixed limitations upon the exercise of their powers, when it prescribed the minimum and the maximum of penitentiary confinement, as the punishment for the several felonies. The exercise of a power by the Courts to control or disturb the verdict of jurors, as to the duration of the penitentiary confinement, would be one of great responsibility ; and which this Court can never be disposed to usurp. Whatever may be the power of the Courts in this respect, is a matter which this judgment will leave wholly undecided. It is, sufficient that in the unanimous opinion of this Court, this case can justify no interposition of the Court on the ground that the punishment found hy the jury has been excessive.
The foregoing are all the, grounds upon which the prisoner, M ’ Whirl, has asked for a new trial. These grounds having been unanimously overruled as to him, are also unanimously overruled as to Ferguson, whose case in the foregoing particulars, the Court regards as substantially the same in point of guilt with that of M’Whirt, with no other real discrimination than that of principal in the first and second degree in the same felony.
*613 But there is another ground on which Ferguson founds his application for a new trial, peculiar to himself: and this ground is the refusal of the Circuit Court to grant to this prisoner a continuance of his trial to the next term."
M’ Whirl had been tried on Saturday the 9th of May ; and Ferguson, when set to the bar on the succeeding „ , „ . Tuesday morning the 12th, moved for a continuance, which was grounded upon the affidavits of the prisoner and his counsel, as to the absence of Edward A. Kenedy and Livingston Kenedy, material witnesses, who had been duly summoned to the Court to testify in the prisoner’s behalf.
The depositions of these two witnesses, as taken at the Examining Court, had been read at the previous trial of M' Whirl by consent; and the object of their testimony was to shew that the deceased was subject to fits, and that the deceased might have died in consequence of fits, which would produce in the interior parts of the head, appearances similar to those which had been ascribed to the violence of the beating he had received from M’Whirt. The testimony of these witnesses had, to the fullest satisfaction of the Judge of the Circuit Court, been utterly discredited by a great number of witnesses, who proved that they were entirely unworthy of belief. The Commonwealth’s Attorney proffered that the same depositions might again be read on Ferguson’s trial, liable to be discredited in the same manner as in M ’ Whirt’s trial. But the prisoner, by his Counsel, and in his affidavit, insisted that he could not safely go to trial without having the Kenedys personally present at the trial; and that he wished to have an opportunity of obtaining testimony to sustain the credit of said witnesses; and confirm the facts to which they would testify ; which testimony would be important aud material to the defence : the prisoner having now been informed that their credit would be assailed. It was in proof, that one of the witnesses resided in the county of Orange, about twenty miles *614 from Spottsylvania courthouse, and that the other had lately removed to Fredericksburg, about twelve miles from the same courthouse. The Circuit Court, in overruling the said motion for a continuance, till the next term, intimated its willingness to postpone the trial to a future day of the then term ; and suggested Friday following as the period of postponement; (it being at the time the motion for continuance was made about midday of Tuesday;) and also intimated that, if moved for in behalf of the prisoners, attachments should forthwith be issued and dispatched by order of the Court to have the said Kenedys before the Court id tithe for trial on Friday, if the trial should be postponed to that day. The counsel for the prisoner, nevertheless, insisted upon the continuance to the next term, unless a more distant day of the then term should be fixed upon as the day of postponement beyond Friday; which last mentioned day, it appeared to the satisfaction of the Circuit Court, as statéd by it in the bill of exceptions, would allow full time, in the interval, to the prisoner to enforce by the process of the Court, or otherwise, the attendance of the said Kenedys ; and might also afford to the prisoner an opportunity, if he or his counsel should think proper, to summon other additional evidence in his behalf. The motion for continuance, notwithstanding these intimations, being still insisted on, was overruled by the Court.
This Court, without adverting to the consideration, how far the motion to put off the trial on account of the absence of witnesses, in' this case, was on account of the absence of witnesses as to character, (1 Chit. Cr. L. 492,) is unanimously of opinion, that the motion was properly overruled ; and that the Court tendered to the prisoner, in the intimations which it gave, all the indulgence that the prisoner could expect or claim at its hands.
The judgment of the Circuit Court is unanimously sustained.
Writ of error denied.