C. J. LAMBERT, Trustee, Appellant, v. REISMAN COMPANY, INCORPORATED, et al., Appellees.

FEBRUARY 12, 1929.

*Thomas J. Bray,* for appellant.

*Devitt & Eichhorn,* for appellees.

MORLING, J.—The bankrupt, S. E. Reisman, long before filing petition in bankruptcy, had transferred his property to the defendant Reisman Company, a corporation, of which his brother, the defendant Charles M. Reisman, and the brother's sons, the defendants Claire R. and Van Reisman, were the owners. The action is brought to recover the value of this property. Inasmuch as the plaintiff sues in his capacity of trustee in bankruptcy, his title to the cause of action is necessarily derivative. Plaintiff alleges that the property was obtained by defendants by fraud perpetrated upon the bankrupt. He also alleges (and in

this court claims that his cause of action is based upon) conspiracy to defraud creditors. If the cause of action is for fraud perpetrated by defendants on the bankrupt, then the cause of action belonged to the bankrupt, and plaintiff derives his title to the cause of action from the bankrupt. If such is his cause of action, plaintiff is proceeding under the first clause of the amendment to Section 8 of the Act of Congress of June 25, 1910, which requires trustees in bankruptcy to "collect and reduce to money the property of the estates for which they are trustees, under the direction of the court * * *." In such case, the plaintiff occupies merely the position of the bankrupt, and if the bankrupt had no cause of action, plaintiff has none. If the action is brought, not to recover an asset owned by the bankrupt,—not on a cause of action which the bankrupt had,—then plaintiff may be said to be proceeding under the succeeding provision of the amendment, which provides that trustees in bankruptcy, "as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a judgment creditor holding an execution duly returned unsatisfied." 36 Statutes at Large 840 (11 U. S. C. A. 180, Section 75).

Defendants contend that the case attempted to be made by plaintiff by his pleading and proof is one to recover upon a cause of action for fraud committed against the bankrupt. It was on this theory that the motion to direct was framed and sustained. The petition, in substance, alleges that plaintiff is the trustee in bankruptcy of the estate of Stephan E. Reisman; "that claims have been filed and allowed against the estate of said bankrupt in the sum of about $2,000; that the value of the property scheduled by said bankrupt is insufficient to pay said indebtedness; and that the property in the hands of the plaintiff belonging to the estate of said bankrupt is insufficient to pay the claims which have been filed and allowed." Plaintiff does not set out when the bankrupt became insolvent, nor when the proceedings in bankruptcy (which were on voluntary petition) were instituted. There is no allegation in respect to the nature of the claims; to whom they were owed; the date at which they were incurred;

whether the bankrupt was, at time of the transfer, insolvent; what the indebtedness of the bankrupt was at the time of the alleged fraudulent acquisition of his property by defendants, about to be referred to; or specifically, that the conveyance to defendants was made to defraud any then existing creditors, or that the creditors now represented by plaintiff were then such. In short, the plaintiff does not, in his petition, place himself in the position of then existing creditors, defrauded by the conveyance to defendants, and having right to attack it as a fraud on creditors, although there are in the petition allegations, as will be seen, of conspiracy and purpose of defrauding creditors. The petition alleges that defendant Reisman Company is a corporation; that the individual defendants are its managing officers, and are father and sons; that defendant Charles is the brother of the bankrupt; that, prior to June 10, 1924, the bankrupt was engaged in mercantile business, owning a stock of goods of the value of about $10,000, fixtures of the value of about $5,000, and a building; that the bankrupt was owing a bank for money borrowed, and on a directors' guaranty (these obligations are not set out as owed by the bankrupt at the time of the bankruptcy, or any later time, and the evidence shows that they had been settled before bankruptcy). The petition alleges that the bank had suspended payment, and that, at the time of such suspension, the bankrupt owned sufficient property not exempt from execution to pay all his obligations; that, immediately after the bank's suspension, the individual defendants conspired for the purpose of defrauding bankrupt out of his property and of defrauding his creditors; that, in furtherance of the conspiracy, defendants represented to the bankrupt that the receiver of the bank would immediately sue him, and his property would be levied on and sold at sacrifice prices, that he would not be able to pay his debts, and would be forced into bankruptcy, and that defendants would take over the property, and "would make the consideration enough so that it would stand in court," and that they would make settlement of his indebtedness to the said bank and other creditors, that, by virtue of having the title to the property, the defendants would be able to obtain time in which to make such payments without sacrificing the property, and that, when settlement of the indebtedness had been made, they would turn the property back to the said Stephan E. Reisman;

that the said Stephan E. Reisman believed the statements so made to him by the said defendants, and relied thereon, and, so believing and relying, executed bills of sale of his stock, fixtures, supplies, motor vehicles, and accounts. The petition alleges that the bankrupt leased his real estate to defendant corporation at a low rental; that defendants obtained this property "with the fraudulent intention of retaining it, and of defrauding the creditors of the said Stephan E. Reisman, and of cheating, defrauding, and swindling the said Stephan E. Reisman out of his property; that the value of the property so obtained by the defendants was the sum of at least $15,000; that the defendants entered into some settlement with the receiver" of the bank, by which the bank accepted a deed to the real estate, in settlement of all sums owed to it; "and that no part of the property obtained by the defendants from the said Stephan E. Reisman was used in making said settlement or in making payment of any other indebtedness owing by" the bankrupt, except $2,000; "that the plaintiff, as trustee in bankruptcy of said estate, brings this action to recover from the defendants the value of the property obtained by and through fraud, as aforesaid." The prayer is for judgment for $13,000, and interest from June 10, 1924. By bill of sale made by the bankrupt to defendant corporation, dated June 10, 1924, which is made an exhibit, attached to the petition, payment of the consideration, $4,000, was to be made by paying all merchandise bills for which the bankrupt was indebted and the stock liable under the Bulk Sales Law. The balance "shall be paid to the first party in full for the property herein sold. Second party further agrees to retain first party in its employment at a minimum salary of $100 per month for a reasonable time. * * * First party further hereby sells stock office which is located in wooden building" described.

The bankrupt's testimony was the plaintiff's principal evidence. He testified to his indebtedness to the bank on note for $6,700, and on guaranty for $16,000, to the failure of the bank, to seeing his brother, defendant Charles, the next day after the bank closed. The bankrupt testified:

"I had confidence in him [his brother] at that time. I told him about the bank failure. Charles and [defendant] Claire were both there. They said they knew I would get into it sometime. Charles asked how much I owed the bank, and I told him,

as near as I could. He said, 'Do you know you are up against it?' 'Well,' I says, 'One thing I know, if I have got to dig up $10,000 to straighten up with the bank, I do not know where I would get it.' * * * I told him there would be a $2,000 note due in about 30 days. He says, 'Do you know what that bank receiver will do to you? * * * He will close you out, * * * and sue you, and he will take everything you have * * * You won't have nothing left. * * * We have got to do something to help you out, —have got to conserve your property some way. I will see an attorney, and we will find out how we can do it.' * * * Claire * * * says * * * 'Who would you rather trust than us, to turn it over to? * * * This thing has got to be done at once. They will go right after you.' He got me scared. I came back the next morning. Claire said, 'We saw the attorney Mr. Devitt. We have employed him for your attorney. We will go over there and have the thing all fixed up. * * * We will buy the store. We will pay you $100. * * * you give us a bill of sale for $4,000. We will have to make the stock look like $4,000. We will haul some of it over here. We may have to fight this out in court with the bank receiver.' He said he would give me $100 a month for my services. * * * 'We will lease your buildings at $25 a month. This will put us in a position to dictate some of the terms to the bank, and give us time to clean up the stuff and pay them off, and when we get straightened with the bank, we will turn the property, or what is left, back to you. You do not deed us the property; you just keep the property. If the bank says anything, * * * Mr. Devitt will say to them, "If you want the property, just go and take it;" and with that $25 a month lease on it, they won't take it, and that will put us in a position to dictate the terms, or at least give us time to clean up and settle with them.' Charles Reisman was present, and took part in the conversation. I believed all they said. I had confidence in them. * * * At the time I saw these people, I certainly believed that what they told me at that time, they would do. If my brother and his son, Claire, had not made these statements and representations to me, I would not have signed these papers. * * * They sent their truck, and commenced hauling out goods to make it look like $4,000 * * * the value * * * was three or four thousand dollars * * * They said, 'We have got to get rid of a lot of these goods,' and they commenced putting on a big sale * * *

to make it look like $4,000, so it will stand in court. * * * They said, 'We are going to keep a record of this, everything you send over, and we will give you credit for everything that comes here; and after we get the settlement with the bank, we will turn it back to you.' * * * We continued to run it in this way until they got a settlement with the bank, about April, 1925. * * * They said that Legoe told them these church people had come to him, and was going to sue me for $2,000. He said, 'Now, in order for you to keep from paying that $2,000, you better give us a bill of sale for these fixtures. [This bill of sale was made April 20, 1925.] * * * I believed the property would be turned back to me. * * * Claire said, one time * * * 'Now you might die, and you have got a credit here of $4,000, or two or three or four thousand. You better have your things fixed up in some way. If you would die, or we would die, we might have difficulty in settling up with your wife. Better get this thing fixed up.' I said, 'What is your hurry? We have not got that $1,000 of that church deal fixed up yet.' I was getting my salary, and everything was going all right.''

The bankrupt proceeds to state that defendants made him an offer of settlement which was unacceptable; that a statement rendered by defendants showed $2,350.27, less the attorney's bill, coming to him, and he never got that; that ''they still have the property they got from me.'' His testimony sets out his property (in part), its value, and that he was owing $2,800 to merchandise creditors, and some other debts. This testimony was offered by the plaintiff on direct examination of the bankrupt. On cross-examination, the bankrupt insisted that, while the defendants' purpose was to defraud the bank, he had no idea of it at the time, though he also says:

''Q. Well, then, as a matter of fact, you engaged in a phony sale, and knew it all the time? A. Yes, sir.''

He also says that he told his brother that, if he would give him the fixtures and $8,000, ''we would call it square;'' that he (bankrupt) put a padlock on the door of the store building, then filed a petition in bankruptcy, ''dug up'' two or three creditors, and got his wife to file a claim for $500, and urged (or suggested to) the trustees of the church to file claim.

We are of the opinion that the cause was pleaded and pre-

sented by plaintiff on the trial as an action by the trustee to recover a liability owed to the bankrupt, in the shape of a cause of action for fraud perpetrated on him by making the representations which have been referred to, inducing him to trust defendants with his property, on the understanding that it was to remain his, and they would account to him for it; that their then purpose, and after they got the property, their efforts in fact, were to cheat the bankrupt, and therefore the bankrupt was entitled to recover the value of the property obtained by defendants through fraud on the bankrupt. In an action by defrauded vendor against the fraudulent purchaser, the value of the property obtained by the fraud, less what plaintiff has received, is the proper measure of damages. 27 Corpus Juris 92. This is what the plaintiff here claims to recover. The motion to direct verdict was evidently framed, and sustained by the court, on the theory that the plaintiff was suing for fraud perpetrated by defendants on the bankrupt in obtaining his property by false pretenses. The record does not show that plaintiff disputed that such was his theory. Manifestly, on the plaintiff's evidence, the fraud thereby shown was a fraud on creditors. The bankrupt (notwithstanding his denials of knowledge of the defendants' purpose) was a party to the fraud. If the bankrupt had brought the action, the court would have left him where it found him— would have granted him no redress. 27 Corpus Juris 7. The plaintiff, seeking to recover upon the bankrupt's alleged cause of action, would be in no better position. Plaintiff insists in this court (quoting from 7 Corpus Juris 249):

"A trustee in bankruptcy may maintain an action in trespass to recover damages arising from an alleged unlawful conspiracy entered into by defendants prior to the adjudication of bankruptcy fraudulently and collusively to transfer and to conceal moneys of the bankrupt for the purpose of hindering and delaying his creditors."

The only reference in support of this proposition is to *Sattler v. Slonimsky*, 199 Fed. 592. This case is relied upon by plaintiff. That decision was made by one of the Federal courts in Pennsylvania, on the authority of Pennsylvania cases, and announces the rule prevailing in that state, that a defrauded creditor may resort to such an action. *Mott v. Danforth*, 6 Watts

(Pa.) 304 (31 Am. Dec. 468). The *Sattler* case was an action in trespass, to recover damages from conspiracy to fraudulently transfer the moneys of the bankrupt, for the purpose of hindering and delaying creditors. As has been shown, the petition here is not framed, nor was the case tried, on that theory. Furthermore, the Pennsylvania doctrine which has been referred to is contrary not only to the weight of authority, but, so far as we have been able to discover, to all authority elsewhere; and we think it is unsound in principle. A general creditor has no legal interest in his debtor's property, and consequently no right to recover on account of any injury or loss to it. The debtor may sell his property; may apply it, in whole or in part, on his debts; may assign it in trust for creditors; may lose it. Other creditors may subject it. In an action by a general creditor for damages for fraudulent transfer, it would be impossible for the plaintiff to prove that, if the property had not been fraudulently conveyed, he would ever have acquired any interest in that property, or that by the transfer he has been defeated of any right in that property. The most that he can say is that he had a more or less remote chance by judicial procedure to obtain a levy upon it, and that what he has lost is not the property, but that chance of subjecting it. In this case, it is not alleged or proved that the defendants do not have the property, or its proceeds, or that creditors have lost their right to follow it, or that plaintiff himself can no longer follow it. If one general creditor has the right to maintain such an action for damages, each and all general creditors have the same right. Any number of actions at law may be brought simultaneously or successively by different creditors in the same or different courts. As illustrative of the difficulty in principle of sustaining such a right of action, without deciding it to be insurmountable, we may say that such an action would be on the case, and purely collateral to the debt. The action would not constitute process for satisfying the debt, but for collecting damages for loss of a collateral right. What the creditor would recover in such case would be damages,—not the debt, or any part of it. By such action the creditor is not following or recovering the property of his debtor, and if he succeeds, he receives nothing from the debtor, nor is anything that he receives, as such, received as payment on the debt. It is true that, in *Mott v. Danforth*, 6 Watts (Pa.) 304, the measure

of damages is held to be "the value of the property withdrawn from the reach of the plaintiff by the assignments, and not the amount of the debt due to the plaintiff;" but the plaintiff, under such a rule, is suing at law upon his own cause of action, not upon a cause of action in behalf of himself and others. What right has he to the property, or to recover its value, that any other creditor does not have; and, if he may recover the value on a collateral cause of action for fraud, why may not other creditors do the same; and on what theory is an action by one creditor for fraud perpetrated on him a bar to an action by another creditor for the same fraud perpetrated on him? That which either creditor would recover would be his damages; not the debt, or any part of it. In such case, the creditor is not following or recovering the property of his debtor. The fraudulent transferee obtains the property, and if the property itself is once subjected to the claims of creditors, he no longer has it, and is under no further liability for it. But if he is liable on a collateral cause of action on the case for damages for fraud to one creditor, why is he not liable indefinitely to all? It may be that the rule in Pennsylvania is influenced by the absence of general chancery powers in the courts of that state, and the action on the case and rights of other creditors would be there subject to limitations analogous to those which would be applied in chancery. See 21 Corpus Juris 26, 34. In states in which courts of chancery exist, such limitations at law would be not only anomalous, but contrary to the fundamental principles upon which courts of common law and equity divergently proceed. That a defrauded creditor has no cause of action at common law to recover of a fraudulent grantee of the debtor's property the value of the property transferred, but that he must proceed against the property itself, or its proceeds, we think is true on principle and sustained by authority. *Bitzer v. Washburn,* 121 Iowa 462; *Goddard & Sons v. Guittar,* 80 Iowa 129; *Moody v. Burton,* 27 Me. 427 (46 Am. Dec. 612); *Wellington v. Small,* 3 Cush. (Mass.) 145 (50 Am. Dec. 719); *Adler v. Fenton,* 24 How. (U. S.) 407; *Blum v. Goldman & Son,* 66 Tex. 621 (1 S. W. 899); 27 Corpus Juris 415; *LeGierse & Co. v. Kellum & Rotan,* 66 Tex. 242 (18 S. W. 509); *Green v. Kimble,* 6 Blackford (Ind.) 552. In the case of a conveyance fraudulent as to creditors, a creditor may disregard the transfer, and follow the property as that of the

debtor. He may proceed at law, by attachment or execution, by levy or garnishment; or, on observing the prerequisites thereto, may proceed in equity against the property. Thereby he sues, not for damages for fraud, but to obtain an equitable levy or an equitable lien upon, and to subject, the property itself. If the property has been disposed of, the proceeds in the hands of the fraudulent grantee may not be recovered at law, but may in equity be impressed with a trust. *Rutledge v. Evans,* 11 Iowa 287; *Lawrence. v. Bank of the Republic,* 35 N. Y. 320. After acquiring such lien or establishing such trust, the creditor has an interest in the property, or, in the latter case, in the proceeds, and may, of course, maintain an action for subsequent fraudulent disposition. *Rutledge v. Evans,* 11 Iowa 287; *Braem v. Merchants' Nat. Bank,* 127 N. Y. 508 (28 N. E. 597). The principle is that the conveyance, being fraudulent as to creditors, may be disregarded. The property as to creditors remains that of the debtor. The creditor's remedy is against the property,— against that which has been fraudulently diverted from payment of the grantor's debts. 12 Ruling Case Law 615.

Error is assigned on overruling motion to strike from amendment. to answer, and in admission of evidence. Even though there. were error in the rulings complained of, it would be without prejudice.—*Affirmed.*

ALBERT, C. J., and STEVENS, FAVILLE, and DE GRAFF, JJ., concur.

WAGNER, J., not participating.