TRAVELERS INDEMNITY COMPANY, appellee, v. MELVIN E. CORMANEY et ux., appellants.

No. 51834.

(Reported in 138 N.W.2d 50)

November 16, 1965.

West, McGrane & Haugan, of Des Moines, for appellants.

Bannister, Carpenter, Ahlers & Cooney, of Des Moines, for appellee.

RAWLINGS, J.—In action by plaintiff subrogee of former employer, trial court entered decree in equity holding former defendant employee had embezzled funds of former employer, that subsequent transfer of all properties of former employee to informed defendant spouse by means of property settlement agreement, made part of divorce decree, and placing one tract of land in name of daughter of defendants, constituted fraudulent conveyances, granted judgment to plaintiff against defendant former employee, impressed lien accordingly upon all realty involved, and ordered execution to issue.

Appealing defendants, Melvin E. and Alma L. Cormaney, were married in 1942. They had one child, a daughter, hereinafter referred to as LaNonne. In 1946 Melvin became a grain elevator manager at Cumming, Iowa, for Cargill, Inc. His starting salary was $160 a month. Commencing in 1955 he received "provisional salary checks" ranging from $1100 to $1800 each year. He had full power to buy, sell and store grains of all kinds, and to issue checks in the name of the employer.

Alma first claimed about $4000 in government bonds held by the Cormaneys in 1946, which had been acquired by the saving of Melvin's military service allotments, were used as a start in acquiring real-estate holdings. Later she admitted use of some of these funds for the purchase of livestock. In any event, by March of 1960 these real-estate holdings, acquired subsequent to 1950, were appraised and given a total reasonable value of

$62,662, subject only to a $4800 mortgage encumbrance. In addition Melvin had acquired, paid for, and had on hand a $10,000 truck, two cars, some insurance, household goods, some accumulated cash, and grains either in the field, stored or sealed. Incidentally he had also purchased an automobile for a "girl friend". Some of the real estate was held by Melvin individually and some by Melvin and Alma as joint tenants. The deed to one 20-acre tract disclosed LaNonne to be the questionable grantee. A total of about 340 acres is involved.

The Cormaneys separated in November of 1959. On January 20, 1960, Alma retained Attorney Wilson Ouderkirk and filed her first petition for divorce, claiming cruelty on the part of Melvin. According to a stipulation dated January 19, 1960, entered into as a part of this first action, Alma was to get about one third of accumulated assets, a note for $5000 to be paid within ten years, to remain beneficiary on $12,500 life insurance, and to receive $150 each month from February through September of 1960.

About February 3, 1960, Alma dismissed her first action, retained her present counsel, and filed a new petition for divorce. At the same time she sought and obtained a writ of attachment to secure the sum of $15,000. Melvin appeared February 17 by Attorney J. Rudolph Hansen and on February 19 filed a cross-petition asking that he be granted a decree of divorce.

The latter part of January 1960, a Mr. Mayhew, representing Cargill, was contacted by Alma. She then told Mayhew about the domestic problems, but at that time Cargill had received no warning as to the fund manipulations which were being carried on by Melvin. In April of 1960, some irregularities in Melvin's dealings were noticed and on the twenty-first of that month some Cargill representatives contacted Melvin who soon admitted having enriched himself at the expense of his employer. This he had done by means of devious and sometimes involved manipulations of grains and funds and the issuance of fictitious or split checks. At that time Melvin admitted no knowledge as to the extent of his unjust enrichment, but estimated the amount to be from $5000 to maybe $25,000. Alma was promptly contacted, advised as to Melvin's machinations as an employee of Cargill, and the

admitted embezzlement in a substantial sum not yet fully determined. She promptly contacted her divorce attorney and he immediately stepped in as counsel for Melvin in connection with the Cargill confrontation.

An audit was immediately commenced by Cargill. It was then discovered that by reason of Melvin's varied manipulations any audit as to grain transactions must unavoidably be conducted upon a gross bushels-in and gross bushels-out basis. The audit, completed in August or September of 1960, disclosed a $56,760 shortage.

In the meantime some other tinted transactions were taking place. Melvin's attorney in the divorce action received a typewritten letter dated May 4, 1960, signed by Melvin, directing that the attorney approve a typed property settlement agreement submitted with the letter. By this agreement *Alma was to receive all property*, real, personal or mixed, *to the exclusion of any interest therein by Melvin*, leaving him with no assets whatsoever. Stated otherwise, it was self-evident Melvin was to be left insolvent. Melvin's divorce counsel neither participated in any property settlement discussions, nor did he prepare the agreement. In fact this letter and agreement were both prepared in the office of James P. McGrane, attorney for Alma in the divorce matter and, coincidentally, attorney for Melvin in connection with the Cargill claim. The property settlement agreement bears a notation by Attorney Hansen to the effect Melvin had arranged his own settlement, that the agreement was approved as to form only, at Melvin's direction, and that the decree was not one to be recommended. In fact he later classified it as inequitable.

In any event Alma appeared in court May 6, 1960, with her attorney, but neither Melvin nor his attorney was present. A decree was then entered granting a divorce to Alma and by reference adopting the all-embracing property settlement agreement. Both Alma and her attorney were then well aware of the fact Melvin had appropriated funds of Cargill in a substantial amount and knew Melvin was, by the property settlement agreement, left with no assets with which to reimburse Cargill in whole or in part. Significantly the record fails to disclose this was ever mentioned to the trial court during the divorce pro-

ceedings. Deeds and instruments of conveyance, prepared by Alma's attorney, were signed by Melvin in the absence of Attorney Hansen.

As a result of the audit, plaintiff bonding company entered into negotiations with Cargill and finally a settlement was agreed upon. Cargill conceded Melvin had at times shorted himself in the process of shortchanging his employer. So, after according Melvin credit for $6157, plaintiff finally paid Cargill $50,365 and became subrogated to all rights of the latter against Melvin.

Plaintiff then brought action in equity against Melvin and Alma, aided by attachment, asking judgment against Melvin, that the court set aside all conveyances of real estate or rights in real estate by Melvin to Alma, impress plaintiff's lien upon all realty held by Alma, and order issuance of execution to satisfy the judgment with interest and costs. In addition plaintiff, by amendment to petition, asked the court to adjudge Melvin to be the sole owner of a 20-acre tract described in the deed designating LaNonne grantee, this tract then to stand with other lands to satisfy plaintiff's claim. Except for the question raised as to jury trial defendants do not question plaintiff's action procedurally.

The trial court granted plaintiff judgment against Melvin in the sum of $49,682.34, being the amount finally prayed by plaintiff after amendment to conform to proof, set aside all transfers of realty to Alma, impressed plaintiff's judgment lien upon all real estate held by Alma, except the homestead and subject to a mortgage encumbrance, and impressed a like lien upon the 20-acre tract standing in the name of LaNonne as grantee, with other relief as prayed.

Cases such as this are not novelties because of newness, the only newness being in the novelties of such cases as they arise.

I. The first proposition relied upon by defendants for reversal was the denial of their request for jury trial. There is no merit to this claim.

■ Regardless of the nature of the action it was brought in equity, and absent timely motion was triable in that forum. In re Estate of Hasselstrom, 257 Iowa 1014, 1016, 135 N.W.2d 530,

532, and Dugdale Construction Co. v. Operative Plasterers etc. Assn., 257 Iowa 997, 1007, 135 N.W.2d 656, 662.

In any event, the action as brought stands in equity. Lambert v. Reisman Co., 207 Iowa 711, 717–720, 223 N.W. 541, and 37 C. J. S., Fraudulent Conveyances, section 319, page 1147. And since the case was presented in equity it properly remained there for any purposes necessary to effect a complete disposition of all issues involved. Rehder v. Rankin, 249 Iowa 1201, 1206, 91 N.W.2d 399. Furthermore, the record discloses Alma filed answer November 28, 1960, followed by Melvin's answer on December 2, 1960, but jury demand was not filed until July 18, 1962, the date trial commenced. In the absence of good cause shown there was no reversible error in overruling the belated demand. Rules of Civil Procedure 177 and 178, Code, 1962, and Hampton v. Burrell, 236 Iowa 79, 83, 17 N.W.2d 110. Defendants waived their right, if any, to a jury trial.

As a result the case comes to us for hearing de novo. Simpson v. Bostwick, 248 Iowa 238, 243, 80 N.W.2d 339. While we are not bound by the findings of the trial court, we still give weight to them when considering credibility of witnesses. Iowa Rules of Civil Procedure, 344(f)7, Code, 1962.

II. Plaintiff does not challenge Alma's right to sue for or to obtain a divorce from Melvin. However, as a creditor, or one standing in the shoes of a creditor, plaintiff does vigorously assail the use of a decree of divorce as a tool with which to make and effectuate a fraudulent conveyance. The trial court found the property settlement agreement, later made a part of the divorce decree, was in fact a fraudulent scheme or device employed to defeat the rights of Cargill, and in turn the rights of this subrogated party plaintiff. The factual situation in this case is such as to leave us no alternative but to agree.

The property settlement agreement between Alma and Melvin, prepared and signed in the office of Attorney McGrane, must be initially viewed as a conditional contract—conditioned upon approval by the court, and the granting of a decree of divorce. Olds v. Olds, 219 Iowa 1395, 1406, 260 N.W. 1, 261 N.W. 488; 27B C. J. S., Divorce, section 301(1)c, page 405; and Nelson on Divorce and Annulment, Second Ed., section

13.20, page 501. It was only upon acceptance and approval by the court that the agreement became a final contract. 17 Am. Jur., Divorce and Separation, section 733, page 775.

■ In view of our holding in this case it actually makes little or no difference whether the conveyances by Melvin to Alma were for valuable consideration or were voluntary. Without necessarily deciding the issue, we shall assume bona fide conveyances by one spouse to the other pursuant to the terms of a valid and equitable property settlement agreement, approved by the court and made part of a decree of divorce, have all the indicia of conveyances for valuable consideration. See McNally v. Emmetsburg National Bank, 197 Iowa 602, 192 N.W. 925, 928, and 37 C. J. S., Fraudulent Conveyances, section 170, page 988.

■ ■ This then means the challenged dealings between Alma and Melvin could not be set aside if Alma acted in good faith and without knowledge or notice of any intent on the part of Melvin to thereby defraud Cargill. As was said in Terre Haute Brewing Co., Inc. v. Linder, 233 Iowa 359, 366, 7 N.W.2d 16, "* * * the deed, assuming there was valuable consideration for it, may not be set aside as fraudulent if the grantee acted in good faith and without knowledge or notice of any intent by the grantor to defraud his creditors. Fraud on the part of the grantor alone is insufficient to invalidate the conveyance. [Authorities cited.] The relationship of husband and wife between grantor and grantee is not in itself sufficient to show fraud although it is a circumstance calling for scrutiny. [Authorities cited.]"

■ And, the proof of fraud must be clear, satisfactory and convincing. Knabe v. Kirchner, 228 Iowa 1156, 1170–1172, 293 N.W. 433.

■ III. However, as was stated in the case of First National Bank v. Hartsock, 202 Iowa 603, 604, 210 N.W. 919:

"Fraud is not committed openly. It is an offense of secrecy. Direct evidence is rarely obtainable. Frequently it can be shown only by the circumstances admitted by the parties to it. Fraud may, and usually must, be proved by circumstantial evidence. The individual circumstances are usually inconclusive, and, attacked separately, may be blown away. The circumstances must

ordinarily be considered together, and the force and weight to be given them are that of them in combination.

"The circumstances of a bona-fide transaction are ordinarily consistent with each other, and with generally recognized business methods and fair dealing, and not incredible. A fraudulent transaction naturally begets stilted, contradictory, and incredible evidence. The bona-fide transaction and the fraudulent one each has its well recognized indicia. As said in Jones v. McGruder, 87 Va. 360 (12 S.E. 792, 798):

" 'A transaction may, of itself and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, and even the evidence of witnesses. The circumstances attending and following a transaction are often of such a character as not to leave even a shadow of doubt as to the real object and motive of the parties engaged in it. * * * The motives and intentions of parties can only be judged of by their actions and the nature and character of the transaction in which they are engaged. These often furnish more conclusive evidence than the most direct testimony.' "

Then in Commercial Savings Bank v. McLaughlin, 203 Iowa 1368, 1369, 214 N.W. 542, we said: "The essential issue involves the fraudulent intent. Blood relationship between the parties is not per se a badge of fraud, although it strengthens the inference that arises from the circumstances, *and requires strict proof of* the consideration and *the fairness of the transaction.*" (Authorities cited.) (Emphasis supplied.) See also 24 Am. Jur., Fraudulent Conveyances, section 22, page 179.

Also in Barks v. Kleyne, 198 Iowa 793, 795, 200 N.W. 439, this court said: "Briefly stated, the creditor of an insolvent debtor must act in good faith, and not intermingle his motive and intent with the debtor to assist the latter in his scheme to defeat other creditors. If he does, he will find himself stripped of the protection which the law otherwise would accord him." (Authorities cited.)

And, as was stated in Pike v. Coon, 217 Iowa 1068, 1072, 252 N.W. 888: "The facts in this class of cases are different in nearly every case, and each case must therefore be decided upon its own peculiar facts." See also 24 Am. Jur., Fraudulent Conveyances, section 20, page 177.

IV. We turn now to the factual situation involved in the case before us. A brief analysis will most surely suffice. Here we have an admitted embezzlement of funds of an employer by the husband-employee. Strained domestic relations developed between the husband-employee and his wife. They separated and she sought a divorce. This was followed by a property settlement agreement which, if effectuated, would have given the wife not more than one half the assets accumulated during marriage. Then the wife engaged a new attorney, dropped her first divorce action, and started another. This second action remained relatively dormant until the wife was advised as to the husband's misappropriation of his employer's funds in a substantial, but not yet definitely determined, sum. Then the wife went into action. Her second divorce attorney was contacted and he promptly stepped in as counsel for the husband relative to the embezzlement. When it developed a settlement could not be effected between the husband and his former employer, the wheels really started turning, but they turned behind a shell of secrecy. The husband's attorney, J. Rudolph Hansen, received a typed letter from his pseudo client directing that a property settlement agreement enclosed with the letter be approved.

The letter and agreement *were prepared and signed* in the absence of Mr. Hansen in the office of Alma's attorney, who, as previously disclosed, was also Melvin's attorney in the embezzlement matter.

According to this communication Mr. Hansen was to be absolved from all responsibility in placing his stamp of approval upon the settlement agreement. This is most understandable when the terms of the agreement are considered. It specifically provided *all* assets, real, personal or mixed, be and become the sole property of the wife. The record discloses those assets had a total net value of approximately $75,000. In effect, the agreement left Melvin with little more than he possessed the day he arrived in this world. Insolvent? According to the record Melvin had one choice—join a breadline. Winnebago Auto Co. v. Bilstad, 231 Iowa 613, 1 N.W.2d 704.

Alma and her attorney then appeared in court at which time she was granted a decree of divorce which, by reference, adopted

in toto the all-embracing property settlement agreement. Neither Melvin nor his attorney was present and the court was never advised as to the embezzlement of Cargill funds by the then absent defendant-husband.

V. There are no doubts to be resolved in this case. Alma most assuredly intermingled her motive and intent with that of Melvin to hinder, defeat and further defraud Cargill, and in turn this plaintiff. In fact there is good reason to believe Alma was the motivating party. She sought everything, knowing Melvin would be left insolvent if and when the plan matured.

This agreement was not only unreasonable and inequitable, it reeked of fraud. First National Bank v. Hartsock, supra, and Central City Savings Bank v. Snyder, not contained in Iowa Reports, 176 N.W. 695, 697.

We have repeatedly held upon dissolution of marriage a grant to one spouse such as the one here concerned was inequitable, unconscionable and could not stand. See Blaney v. Blaney, 256 Iowa 1151, 130 N.W.2d 732.

Having the right and standing to so do plaintiff complained. Stewart Lumber Company v. Downs, 142 Iowa 420, 422–424, 120 N.W. 1067, 29 L. R. A., N. S., 1190, 19 Ann. Cas. 1100, and chapter 639, Code, 1962.

VI. Defendants also contend the trial court erred in establishing the claim of plaintiff as a prior lien on the property.

The homestead was not included in the lien impressed properties. It was properly excluded. Hall Roberts' Son, Inc. v. Plaht, 253 Iowa 862, 114 N.W.2d 548. Also, the prior mortgage encumbrance of about $800 was given proper recognition.

Apparently defendants lean heavily upon Hall Roberts' Son, Inc. v. Plaht, supra, to support their claim, but that case is not in point. In the cited case a husband had transferred an undivided half interest in some heavily encumbered lands to his wife. This court held, except as to an unencumbered ten-acre tract, there was insufficient showing the husband had parted with property having substantial value, or that the complaining creditor had been harmed.

In the case before us the record is devoid of any evidence

disclosing Alma ever contributed funds to aid in acquiring any part of the real estate here involved. Her rights could rise no higher than those possessed by Melvin, so neither of them has standing to assail the stamp of priority placed upon plaintiff's claim, and Melvin's rights were inferior to those of plaintiff.

VII. However, the court did include in the properties covered by the impressed lien a tract of land referred to as the Johnston 20 which stood in the name of LaNonne A. Cormaney.

Without here deciding the issue, this tract might have been subjected to plaintiff's lien had proper proceedings been followed. The record discloses *it was not included in the lands attached* under plaintiff's petition when first filed. In fact plaintiff endeavored to include this land in the proceedings only by a third amendment, filed at the close of the trial, but did not then or thereafter take any steps to bring it within the jurisdiction of the court by any writ of attachment. Neither was LaNonne made a party to the action. In fact, she was not even called as a witness. Also, this tract was not included in any lands which Melvin conveyed, or tried to convey to Alma.

The record does disclose the name of LaNonne, as grantee, had been superimposed on the instrument of conveyance over an erased name, and there was some evidence presented indicating the deed to this tract had never been delivered to LaNonne.

Such alone is not enough. The court never acquired requisite jurisdiction either in rem or in personam to determine rights as to this property, and any order, judgment or decree entered as to same was of no legal force or effect. Chapter 639, Code, 1962; Federal Land Bank v. Jefferson, 229 Iowa 1054, 295 N.W. 855, 132 A. L. R. 1282; Rules of Civil Procedure 48, Code, 1962; and 20 Am. Jur.2d, Courts, section 94, page 455, and section 105, page 464.

VIII. The verdict rendered by the trial court is also assailed as being excessive. The audit disclosed a total of $56,760 embezzled by Melvin. Plaintiff bonding company paid $50,603 to Cargill. Then, through a crediting process, the amount sought by plaintiff was ultimately reduced to $49,628.34, and judgment for that sum was granted.

Defendants admit the audit properly reflected shortages in

local sales, conversion of Cargill checks, issuance of checks to fictitious payees, checks to Cormaney and Strable, and storage charges, but generally dispute the audit as to gross bushel shortage, overpayments to Melvin on purchases, and undercharges to Melvin on sales.

The audit by Cargill was carefully scrutinzed by competent auditors employed by defendants. The record discloses some differences in thought by the two auditing groups as to methods or techniques, but no material variances as to findings made by the Cargill audit. Defendants' auditors admitted a net bushel method of auditing was impossible, and that, in the acknowledged absence of proper records, a test check of dollar profits could not be made.

The books and records of the Cargill elevator at Cumming, Iowa, were utilized in effecting the computation. Known buyers were contacted and their records checked against those in the elevator. As a result some 3200 altered documents were discovered. Twenty boxes of original books and records consisting of thousands of instruments used in making the audit were in the courtroom during trial, and were made available for inspection by the court or by counsel for defendants. The Cargill auditors were called as witnesses, testified and were cross-examined at length as to their findings. Also, a summary of the audit was presented in evidence. The record made was proper and sufficient. Gregg v. Middle States Utilities Co., 228 Iowa 933, 944, 945, 293 N.W. 66, 132 A. L. R. 415; 20 Am. Jur., Evidence, section 449, page 399; and 32A C. J. S., Evidence, section 789, page 111.

The trial court granted plaintiff judgment in a sum substantially less than that disclosed by the audit. We find no reason to disagree with the amount determined by the court to be due plaintiff.

IX. Plaintiff's prayer the deed to the 20-acre tract designating LaNonne A. Cormaney as grantee, be adjudged ineffective, null and void as a conveyance to her, and that it be subjected to plaintiff's lien should have been denied. We are satisfied that save and except for inclusion of this 20-acre tract as one of the properties impressed with plaintiff's lien, the trial court did equity.

250

Affirmed in part, reversed in part and remanded for entry of decree not inconsistent herewith.

All JUSTICES concur.