**Luke KRIENER and Leona Kriener, Appellants,**

v.

**TURKEY VALLEY COMMUNITY SCHOOL DISTRICT, Appellee.**

**No. 54862.**

Supreme Court of Iowa.

Nov. 14, 1973.

C. J. Anderson, Cresco and Strand & Anderson, Decorah, for appellants.

Miller, Pearson & Gloe, Decorah, for appellee.

Heard before MOORE, C. J., and RAWLINGS, LeGRAND, REES and REYNOLDSON, JJ.

RAWLINGS, Justice.

By action in equity plaintiffs, as owners-occupants of a dairy farm, seek injunctive relief and damages by reason of a nuisance allegedly created by construction and maintenance of defendant school district's sewage lagoon.

Trial to the court resulted in an adjudication adverse to plaintiffs and they appeal. We affirm in part, reverse in part.

An understanding of the problems instantly presented necessitates a prefatory portrayal of the asserted events upon which this cause of action is predicated.

In 1953 plaintiffs Luke and Leona Kriener purchased a 120 acre Winneshiek County farm located near Jackson Junction.

The Krieners promptly started dairy farming. At the same time they embarked on a herd, milk facility and home improvement project. By 1964 the herd had been increased from four or five cows and

probably the same number of heifer calves to about 50 grade cattle, some pure bred, an equal number of "springing heifers", and an unknown number of calves.

Also, by 1964 Krieners had caused to be constructed on the farm a modern milk house and milking parlor, cement stave silo, new granary, a concrete covered livestock courtyard and walkway. Within the same period a modern home was built.

As a result of these improvements the Krieners, in August of 1959, moved directly from a "Grade B" classification to an improved "Grade A" milk production program.

By 1967 plaintiffs had added a cattle loafing or free-stall barn, and new Harvestore silo.

In 1963 defendant school district started using a new high school located near Jackson Junction. The sewage disposal system, utilized in connection therewith, consists of a stabilization pond or lagoon located about 40 feet east of the Kriener property. This farm is intersected by Highway 24, with a 9–10 acre pasture tract being situated on the same side of the road as the lagoon. Prior to 1964 plaintiffs' cattle were customarily pastured in this area.

A small creek runs in a westerly direction near the pipe outlet of the school sewage lagoon. Effluent from this stabilization pond runs into the creek, thence across Krieners' farm. Their home and appurtenant structures, *supra*, are about one-half mile from the lagoon. The aforesaid creek is, at one point 200 feet from plaintiffs' dairy building site and home area.

Plaintiffs contend that after defendant commenced using the sewage lagoon in 1963, offensive and sickening odors emanting from the lagoon and effluent therefrom in the nearby creek were noticeably present on the Kriener farm. At times these odors permeated their home and milking facilities.

Commencing in 1964 and continuing into 1966 most of plaintiffs' 35–40 calves died shortly after birth. The Krieners also then encountered a herd mastitis problem. In an attempt to correct the situation plaintiffs tried numerous veterinarians, various treatments, called in sanitation inspectors, and changed equipment, feeds and medicines, all to no avail. Krieners were consequently twice dropped from the "Grade A" program and suffered a loss in milk production. They were resultantly forced to sell about 52 dairy cattle on the slaughter market and replace them with presumably healthy milk producing stock.

During the same year Krieners started using some drugs produced by Impro Products. Representatives of that firm visited plaintiffs' farm and in 1966, on their recommendation, use of the aforesaid pasture tract was totally discontinued because the above mentioned creek bed was there accessible to the cows. All livestock was thereafter pastured in another area fenced off from the creek. No herd mastitis problem was subsequently encountered.

Also in August 1966, defendant school district, through its superintendent and board, was given oral notification by Mr. Kriener regarding the alleged lagoon related nuisance.

By their petition plaintiffs seek damages and injunctive relief because of alleged nuisance created by defendant school district in the maintenance and operation of a sewage lagoon which has caused injurious pollution of (1) air, and (2) creek water.

Defendant school district categorically denies any plaintiff asserted nuisance has resulted from creation and usage of the sewage lagoon.

These matters and attendant conflicting testimony, introduced by both parties hereto, will be later considered as it relates to issues instantly presented.

In support of a reversal plaintiffs here assert trial court erroneously found and

held they had not established by the requisite degree of proof (1) existence of a nuisance, (2) entitlement to damages and (3) right to injunctive relief.

■ I. At the threshold it will be noted plaintiffs' petition invokes jurisdiction in equity though compensatory relief is in part sought. The propriety thereof is neither here disputed nor could it be effectively challenged.

As stated in Grandon v. Ellingson, 259 Iowa 514, 518, 144 N.W.2d 898, 901 (1966):

> "It is conceded the allegations of plaintiff's petition called for equitable jurisdiction. ' * * * once equity has obtained jurisdiction of a controversy it will determine all questions material or necessary to accomplish full and complete justice between the parties, even though in doing so it may be required to pass upon some matters ordinarily cognizable at law.' (Authority cited)."

See also Rule 320, Iowa R. Civ.P.; Travelers Indemnity Co. v. Cormaney, 258 Iowa 237, 242, 138 N.W.2d 50 (1965); Newton v. Grundy Center, 246 Iowa 916, 922, 70 N.W.2d 162 (1955); McClintock on Equity, § 52, at 121 (2d ed. 1948); R. Sorenson, "The Law of Nuisance in Iowa", 12 Drake L.Rev. 107, 113–116 (1963); 27 Am.Jur.2d, Equity, §§ 108–110; 30 C.J.S. Equity §§ 67–72.

II. Since this case stands in equity our review is de novo. We accordingly give weight to trial court's findings are not bound by them. See Iowa R.Civ.P. 334, 344(f)(7).

■ III. Plaintiffs unquestionably acquired and located on their farm prior to construction of the school and its service related lagoon. This factor weighs heavily in favor of the Krieners. See Patz v. Farmegg Products, Inc., 196 N.W.2d 557, 561 (1972); Bates v. Quality Ready-Mix Co., 261 Iowa 696, 704, 154 N.W.2d 852 (1967).

In other words, what is commonly known as "coming to the nuisance" concept is not instantly involved. See generally East St. Johns Shingle Co. v. City of Portland, 195 Or. 505, 246 P.2d 554, 556–563 (1952); 58 Am.Jur.2d, Nuisances, § 216; Annot., 42 A.L.R.3d 344.

It is also of no consequence that plaintiffs voiced no objection to construction of the school and sewage lagoon. See Amdor v. Cooney, 241 Iowa 777, 785, 43 N.W.2d 136 (1950); Andrews v. Western Asphalt Pav. Corp., 193 Iowa 1047, 1050–1052, 188 N.W. 900 (1922).

■ IV. Neither is existence of a nuisance affected by lawfulness of an offending establishment or absence of intention to injure. See Patz v. Farmegg Products, Inc., *supra*. See also 66 C.J.S. Nuisances § 9.

■ In the same vein it is generally understood a school board is not immune from an action for injunctive relief and damages brought by a party injured in person or property as the result of a school related nuisance. See Wayman v. Board of Education, 5 Ohio St.2d 248, 215 N.E.2d 394, 396–397 (1966); 58 Am.Jur.2d, Nuisances, § 55; 43 C.J.S. Injunctions § 31.

V. On the other hand, as stated in 58 Am.Jur.2d, Nuisances, § 214:

> "Nuisance claims of private owners must at times yield to public interest and convenience, and under the pressure of public necessity what would otherwise constitute a nuisance may be inflicted upon certain members of the community, subject to the limitation that if the creation or maintenance of the nuisance amounts to a taking of private property compensation therefor must be made. When the public welfare requires it a nuisance may, for special purposes, be permitted, and, as has been seen, public convenience or necessity may be taken into consideration in some cases in determining whether or not to grant equitable relief."

VI. Pertinent at this point are these observations in Bates v. Quality Ready-Mix Co., 261 Iowa at 702–705, 154 N.W.2d at 857:

"Section 657.1 (Iowa Code) provides: 'Whatever is * * * offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the same and to recover damages sustained on account thereof.'

"Code section 657.2 states: 'The following are nuisances: 1. * * * using any building or other place for the exercise of any trade, * * * which, by occasioning noxious exhalations, offensive smells, or other annoyances, becomes injurious and dangerous to the health, comfort, or property of individuals * * *.'

"* * *

"The above statutory enumerations do not modify the common-law application to nuisances. The term 'private nuisance' refers to an actionable interference with a person's interest in the private use and enjoyment of his land. (Authorities cited).

"One must use his own property so that his neighbor's comfortable and reasonable use and enjoyment of his estate will not be unreasonably interfered with or disturbed. (Authorities cited).

"Noises may be of such a character and intensity as to so unreasonably interfere with the comfort and enjoyment of private property as to constitute a nuisance, and, in such cases, injury to health of the complaining party need not be shown. (Authorities cited).

"A fair test of whether the operation of a lawful trade or industry constitutes a nuisance has been said to be the reasonableness of conducting it in the manner, at the place and under the circumstances in question. (Authorities cited). Thus the question whether a nuisance has been created, and maintained is ordinarily one of fact, and not of law, depending on all the attending or surrounding circumstances. Each case of this nature must depend on its own facts." (Authorities cited).

VII. Furthermore, as we said in Newton v. Grundy Center, 246 Iowa at 921, 70 N.W.2d at 165:

[D]efendant-city is charged with emitting offensive materials and substances, engendering offensive odors, corrupting, polluting and rendering unwholesome and impure the waters of the creek on plaintiff's land where he pastures his cattle. Clearly these claims, if proven, will tend to establish a nuisance in that such acts may provide an actionable invasion of plaintiff's interest in the use and enjoyment of his land. (Authorities cited)."

■ VIII. And this court has repeatedly held, a sewage disposal facility is not a nuisance per se but may become a nuisance in fact or per accidens by reason of particular circumstances and location. See e. g., Bader v. Iowa Metropolitan Sewer Company, 178 N.W.2d 305, 307 (Iowa 1970). See also 58 Am.Jur.2d, Nuisances, § 12; 66 C.J.S. Nuisances § 3.

IX.

"Touching on the matter at hand we held, in Iverson v. Vint, 243 Iowa 949, 952, 54 N.W.2d 494, an action for damages from nuisance is not predicated on negligence. It is a condition, not an act or failure to act. If the wrongful condition exists, the person responsible for its existence is liable for resulting damage to others. See also 12 Drake L.Rev. 108." Claude v. Weaver Construction Co., 261 Iowa 1225, 1229, 158 N.W.2d 139 (1968).

See generally Prosser on Torts, § 87 at 573–577 (4th ed. 1971); 58 Am.Jur.2d,

Nuisances, §§ 3, 34; 66 C.J.S. Nuisances §§ 3, 11.

■ X. It is to be additionally understood the burden was on plaintiffs to establish by a preponderance of evidence the existence of a defendant created nuisance which was a proximate cause of resultant damages to person or property as alleged. See Iowa R.Civ.P. 344(f)(6); Andrews v. Struble, 178 N.W.2d 391, 398 (Iowa 1970); Nizzi v. Laverty Sprayers, Inc., 259 Iowa 112, 121, 143 N.W.2d 312 (1966); Bunn v. Standard Oil Co., 251 Iowa 7, 8–9, 99 N.W.2d 436 (1959); 58 Am.Jur.2d, Nuisances, § 24; 66 C.J.S. Nuisances, §§ 8(b), 149.

■ Generally, however, probable cause is determinable by the trier of the facts. See Iowa R.Civ.P. 344(f)(10).

·XI. In light of the foregoing we must now, as best possible, reduce to condensed form the record mass of conflicting testimony adduced in course of a relatively lengthy trial.

As previously disclosed plaintiffs foundation their nuisance action on two grounds, i. e., noxious odors and water contamination. These elements will be entertained in that order.

At the outset Luke Kriener testified in part:

"That stream from the lagoon comes through the underpass of the railroad track. We became suspicious of this lagoon in 1966 and I checked it quite regularly and it was running all summer of 1966 and any day or any week I went up there it was running. I would go up to the lagoon outlet which was on the other portion of my farm. In 1964 I shut my cattle out of that area. I did this because after seeing them in this so called soup up there across the road, why I just took it for granted—common sense could tell you that dairy cows shouldn't be standing in this kind of stuff so I never allowed them to go across the Highway.

In using the terminology, 'soup', when I describe what I saw in late '64, when I got my cattle out of there, was sewer settlings or septic tank settlings, whatever you want to call them, portions, particles, everything along the creek-beds, along the grass and low spots of the creek area were all setting full of this stuff. When I refer to them as sewer settlings they appeared in color and looks, texture as all kinds of white crumbs; there was brown, brittly crumbs in there and all your creek-beds besides from settlings were, I call them junk; I don't know what else, how else to would you say it, but it would be the same thing, as you would expect to go down a sewer. There wasn't much chance for other materials to be in this particular area other than what might come from animals or humans. There is just a few acres of ground there which could have drained into there so there really was no other source where this could come from. There is no barn yard or no other septic tank or anything that I know of that could have caused any portion of the stuff coming down through there. I noticed paper settlings from toilet stools there. This was toilet paper that was mussed up, wet, damp. When I made these observations late in 1964, I kept my cattle out of there. There was always a sharp sewer odors all the time around this creek-bed, particularly up there across the highway. This would be across Highway No. 24. After I excluded my cattle from that nine acre acrea across the highway or in close proximity to this outlet, they were able to get up to the underpass by the road or the railroad. It wouldn't be quite a quarter of a mile from the lagoon outlet to the underpass.

"During the year 1965 and 1966 from the underpass area and from this lagoon area, I could trace runoffs of any kind to my pasture past my homestead. Everytime there was any moisture at all or even continuing after any little moisture,

this sewer would run clear through the lower pasture. There were odors all the time it was running. If the wind would be just right you would have quite an odor in our barnyard, if the wind was from the east. The odor was not from the barnyard, it was from the sewer. It was a stool odor, just like it was raw as you get it, I would say. This odor was distinguishable by me from any odor that might come from livestock. This was outstanding over that."

Then Mrs. Kriener testified, in material part:

"[B]eginning with the year 1964 and with reference to the odors around the area of our home, it would make a difference which way the wind was from where you were working. If you were working with the wind, it came over the sewer towards you, it would give you an awful nauseated feeling. You just didn't feel good all day.

"Q. Well, will you kind of be more specific as to—did it actually have a physical effect or seem to bother you in any way? A. Well, I know I went home for dinner different times, and I couldn't eat. If I would start frying meat or something, why, it would just about bring my breakfast up, and rather than that I would just quit and forget eating.

"Q. Now, would that continue? Would that be just one day or— A. Well, if the odor was—the day was a hot day and we were working right in the wind, where it was coming from the sewer, why—

"Q. Now, during any of the time, when the wind wasn't right in that direction, were there ever any times when there would be any seepage or flow down from the lagoon, in which you would get an odor from the pasture area, itself, if there was, in fact, any flow down that far? A. If you were working quite near it, yes.

"Q. If you were in your house, for instance, in the spring and summer and had windows open, would this—will you state whether or not the odor would ever permeate the house. A. Yes, I know different times there would be a southeast wind, and I would have to close the windows and keep them closed, because you could smell it as soon as you would step outside the door, and I would even use a spray in the house to refresh it.

"Q. Now, as late as the spring of 1969—that would be in the spring of 1969, when it got warmer, did that situation still continue and exist at that time? A. Oh, yes.

"I have been physically present at the point of the lagoon and I got quite close to it. I would say about four or five feet from it. I observed a flow of water coming out of it when I was there in a greenish color and you could smell it when you would get close to it, of course. I think I have been in this area three or four times. I know I was there once last spring when it was flowing out and it would have been in late March and the last time I think would have been in late March. Also I was there last fall, I don't know what month it would have been, I know it was draining out. There is a difference in certain times of the year on the strength of the odor that may come from that area. Up until the first part of the year, in April you don't smell it too much. It is frozen up or cooling and doesn't have as strong an odor until it gets warmer, about the time the fields are ready to go and when you get your first odor is when the weather is really warmed up to the 60's and 70's."

Following is the substance of testimony by other plaintiff-called witnesses:

David Croatt was on the Kriener farm ten times, last about one month before commencement of trial, for the purpose of taking soil samples. He noticed a distinct sewer odor coming from the lagoon.

Wilfred Wanderscheid, a broker-appraiser, while on the premises detected a terrible smell emanating from black colored water flowing from the lagoon into the stream which crosses the Kriener property.

Gale Ludeking is a farmer, livestock feeder and feed salesman. This witness was first on the Kriener farm in July 1967, and about once each month thereafter. Ludeking saw dirty stinking water coming out of the lagoon and could smell it up by the Kriener house.

James Rouse, a salesman, called occasionally at plaintiffs' place from 1965 to 1967. He then observed the lagoon and run-off and twice detected related smells at the milk house.

Martin Winter lives south of Fredericksburg. This party was on the Kriener farm several times each year. He describes the odor, traced by him from the Kriener yard to the lagoon, as being obnoxious and tending to nauseate him.

James Balk, a neighbor of these plaintiffs, detected lagoon traced odors from spring to fall. He described the smell as disgusting and obnoxious, particularly when the wind came from direction of the lagoon.

Mrs. Jerome Praska, while fixing a line fence between the Praska and Kriener farms during the summer prior to commencement of trial, noticed a "quite terrible" and awful lagoon smell.

Defendant school district countered the foregoing array of testimony by calling eight witnesses.

Robert Frederick, a master in science in sanitary engineering, employed by Greene Engineering Co. at time of trial, was previously affiliated with the State Department of Health. Acting pursuant to directions by that agency Frederick investigated the lagoon site. In so doing he several times tested the fluid therein and the flow-off. This witness observed no odor more than 25 feet from the stabilization pond. He also opined the odor could not carry to Krieners' farm, and the lagoon, based on visual observation, was operating properly.

Russell George, Federal Land Bank appraiser, visited the stabilization pond site one day before testifying and then noticed a smell only when within a foot or two from the lagoon.

Robert Taylor, local hunter-trapper, trained his retriever dog in the lagoon and at times there hunted ducks. Taylor once fell in but noticed no particular odor.

Keith O'Connell is the Turkey Valley School Superintendent. He inspected the lagoon at least once each summer month. Within those periods he cupped out water, held it close to his nose and occasionally placed some on his skin, but smelled nothing. O'Connell concedes, however, there is a noticeable lagoon odor for a week or ten days each spring after the ice melts. He has also observed a greenish water seepage or trickle from the pond because the gate is not leak proof.

Jerome Praska, a United States Department of Agriculture employee, has never noticed any odor from the lagoon.

Ronald Donn, Turkey Valley High School principal, is on the school premises and drives past the lagoon practically every day. On two or three occasions over a five year period Donn noted an inoffensive stale water odor.

To the same effect is James Darnall's testimony. He is a Turkey Valley School teacher and driver training instructor. About two weeks prior to trial Darnall lifted the flapper gate lid and then noticed a sewer-like smell.

Arthur Riha, school custodian, mows around the lagoon 8–10 times a year. He never saw solids or toilet paper in the basin but has smelled stale water, not offensive to him, for a short period each spring.

Robert Mayo, head school custodian, has noticed and smelled innocuous odors for

4–5 days each spring, but never any lagoon smell.

Apparently not one of these defense called witnesses, except Russell George, had ever been on the Kriener property. Thus they were in no position to testify regarding odors from the lagoon which may have at any time permeated the Kriener farmyard and home premises.

■ XII. Furthermore, defense counsel, in argument, here leans heavily on testimony to the effect (1) the lagoon was designed and constructed in accordance with accepted engineering standards, approved by the State Department of Health, and (2) it at all times operated properly. But that stand is of slight, if any, benefit to defendant school district.

As this court observed in Ryan v. City of Emmetsburg, 232 Iowa 600, 605–606, 4 N.W.2d 435 (1942):

"Andrews v. Western Asphalt Pav. Corp., 193 Iowa 1047, 188 N.W. 900, holds it was not error to refuse to permit defendant to show that the plant, which caused the nuisance, was operated and constructed in the usual manner.

"In Rand Lbr. Co. v. Burlington, 122 Iowa 203, 97 N.W. 1096, it was said that a city would not be absolved from liability on account of a nuisance from odors from city sewage and sewers by the fact that the system was constructed under general legislative authority, which did not prescribe the manner of construction, or by the fact that the work was done under the direction of skilled engineers."

See also Costas v. City of Fond du Lac, 24 Wis.2d 409, 129 N.W.2d 217, 220–221 (1964); 58 Am.Jur.2d, Nuisances, § 34; 61 Am.Jur.2d, Pollution Control, § 175; 66 C.J.S. Nuisances § 11 at 753–754.

Additionally, the record reveals the stabilization pond was built in 1963 to accommodate a Turkey Valley school population of 600, but by 1970 a total of 1183 students and other personnel were there in attendance.

■ XIII. Moreover, the fact that obnoxious lagoon connected odors which may have carried with the winds were not constantly present on plaintiffs' farm is not here determinative. In other words, the fact that a nuisance is intermittent due to changing seasons, or wind direction variations will not alone prevent the granting of injunctive relief or an award of damages. See 58 Am.Jur.2d, Nuisances, §§ 31, 45; 66 C.J.S. Nuisances §§ 18(d), 115.

■ XIV. Neither does absence of proof to the effect the health of these plaintiffs was impaired by the asserted nuisance preclude their right to any relief here sought by them. See 58 Am.Jur.2d, Nuisances, § 42; 66 C.J.S. Nuisances § 19(e).

XV.

"Of course the standard used in determining whether an invasion involving personal discomfort or annoyance is substantial, is the standard of normal persons in a particular locality. This is not to in any way disparage the expert witnesses called by defendant. However, expert testimony is received in order to throw light on the normal person's standard and not to supplant the standard itself. We approve the following comment which follows section 822, Restatement of Torts 230:

"'If normal persons living in the locality would regard the particular situation as definitely offensive or annoying, then the invasion is substantial, * * * Rights and privileges in respect to the use and enjoyment of land are based on the general standards of normal person. * * *' See also Higgins v. Decorah Produce Co. [214 Iowa 276, 242 N.W. 109 (1932)]" Patz v. Farmegg Products, Inc., 196 N.W.2d at 561–562.

See generally Stockdale v. Agrico Chemical Co., Div. of Con. Oil Co., 340 F.Supp.

244, 252–253 (N.D.Iowa 1972); 58 Am. Jur.2d, Nuisances, § 47; 66 C.J.S. Nuisances § 18(c).

■ And absent evidence to the contrary it is presumed plaintiffs are of normal or ordinary sensibilities. See Kellerhals v. Kallenberger, 251 Iowa 974, 980, 103 N.W.2d 691 (1960).

■ XVI. Mindful of the guiding precepts above set forth we are satisfied, upon our de novo review, plaintiffs established by the requisite degree of proof that maintenance of the instantly involved sewage lagoon constitutes a substantial odor related private continuing nuisance. See Patz v. Farmegg Products, Inc., 196 N.W. 2d at 561–562; Ryan v. City of Emmetsburg, 232 Iowa at 606–611, 4 N.W.2d 435, 58 Am.Jur.2d, Nuisances, §§ 9, 12; 66 C.J. S. Nuisances §§ 2–3; 12 Drake L.Rev. at 107; 57 Iowa L.Rev. 451, 457–467 (1971).

Plaintiffs are accordingly entitled to appropriate redress.

XVII. The foregoing, in turn, poses some problems regarding the remedy or remedies to be accorded these plaintiffs.

■ We shall first focus upon the appropriateness of injunctive relief. In that area courts in this jurisdiction are committed to the "relative hardship" or "balance of convenience" standard. See Riter v. Keokuk Electro-Metals Co., 248 Iowa 710, 722–727, 82 N.W.2d 151 (1957).

■ It is also axiomatic, injunctive relief is an extraordinary remedy to be accorded with caution and only where clearly required. See Dawson v. Laufersweiler, 241 Iowa 850, 859, 43 N.W.2d 726 (1950); 58 Am.Jur.2d, Nuisances, §§ 159, 162; 66 C.J.S. Nuisances §§ 111, 118; 12 Drake L. Rev. at 113–115.

■ Furthermore, it is generally understood an injunction is not mandated where adequate redress can be afforded by a monetary award even though the nuisance be clearly shown to exist. See City of Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. 334, 337–339, 53 S.Ct. 602, 603–604, 77 L.Ed. 1208 (1933); Riter v. Keokuk Electro-Metals Co., *supra*; Friedman v. City of Forest City, 239 Iowa 112, 119–122, 30 N.W.2d 752 (1948).

We are persuaded, however, plaintiffs here clearly established their right to injunctive relief regarding the asserted odor nuisance, but for reasons stated *infra* that form of redress is not at this time granted.

XVIII. In any event the Krieners are entitled to be fairly compensated by reason of any and all annoyances, discomfort and loss of full enjoyment of their property suffered by them as a result of the aforesaid odor nuisance.

On that subject this court said in Boyd v. City of Oskaloosa, 179 Iowa 387, 391–392, 161 N.W. 491, 492 (1917):

"Though injurious consequences, such as sickness and injury to property, may be shown, proof of inconvenience and discomfort from noisome odors and offensive smells, occasioned by the maintenance of a nuisance, is alone sufficient basis for the allowance of damages. Van Fossen v. Clark, 113 Iowa 86, 84 N.W. 989; Holbrook v. Griffis, 127 Iowa 505, 103 N.W. 479; cases collected in 29 Cyc. 1272.

"In 2 Wood on Nuisances, Sec. 866 (3d Ed.), the author says:

" 'In the case of an action for an injury to the comfortable enjoyment of property by a person in possession, no precise rule for ascertaining the damage can be given, as, in the very nature of things, the subject-matter affected is not susceptible of exact measurement; therefore the jury are left to say what, in their judgment, the plaintiff ought to have in money, and what the defendant ought to pay, in view of the discomfort or annoyance to which the plaintiff and his fami-

ly have been subjected by the nuisance; and whether the verdict is large or small, if, in view of the evidence, it has any reasonable foundation, it will not be disturbed because it is too small on the one hand, or too large on the other.'

"This is the rule quite generally sanctioned by the authorities."

See also Miller v. Town of Ankeny, 253 Iowa 1055, 1062–1063, 114 N.W.2d 910 (1962); Duncanson v. City of Fort Dodge, 233 Iowa 1325, 1328–1330, 11 N.W.2d 583 (1943); 58 Am.Jur.2d, Nuisances, §§ 124–125; 61 Am.Jur.2d Pollution Control, § 159; 25 C.J.S. Damages § 28; 57 Iowa L. Rev. at 470–472.

■ XIX. The record in this case reveals plaintiffs own and occupy an attractive home and have developed a high grade dairy facility. It further discloses that from spring to fall, or six months of each year since 1963, the Kriener family had endured nauseating and obnoxious odors emanating from the school lagoon. They have thus suffered substantial annoyance, discomfort and interference with the full enjoyment of their property with every breeze from the south or southeast. For this plaintiffs are entitled to be fairly compensated even though such damage is not susceptible to exact measurement.

■ Our evaluation of the entire record at hand leads us to conclude plaintiffs are entitled to have and receive from defendant damages arising from the aforesaid odor nuisance in the sum of $3600 for each of the years from time the odor commenced to trial time, or from 1964 to 1970, both inclusive. On remand of this case judgment shall be accordingly entered. See generally Miller v. Town of Ankeny, 253 Iowa at 1062–1064, 114 N.W.2d at 914–915. See also Glatstein v. Grund, 243 Iowa 541, 558, 51 N.W.2d 162 (1952).

XX. But that alone is not dispositive of plaintiffs' remedial rights.

We, of course, have no means by which to determine whether the subject nuisance has continued since trial date. Thus a remand is again in order for further showing with reference thereto.

In event defendant has not, prior hereto, effectuated an abatement of the odor nuisance these plaintiffs are entitled to (1) additional attendant damages, and (2) possible injunctive relief.

At this juncture Ryan v. City of Emmetsburg, cited above, again comes into play. There we said, 232 Iowa at 609, 4 N.W.2d at 441:

"In Vogt v. Grinnell, 123 Iowa 332, 333, 98 N.W. 782, 783, city sewage polluted a stream and caused a stench to rise from its waters. We quote therefrom:

" 'The mere fact that the city sewers were of permanent construction did not render the nuisance occasioned by them permanent also, for the municipality had the right at any time to abate it. * * * "In this case, as is shown by the evidence, the remedy is in the defendant's own hands, by work done upon its own land." * * * "Here the remedy could be applied on defendant's own premises, and there can be no doubt of its duty to abate the nuisance." As was said in Hollenbeck v. City of Marion, [116 Iowa 69, 70,] 89 N.W. 210, "Modern scientific research has discovered means of disinfecting and deodorizing sewage so that it is practically innocuous. * * * While the system may be said to be permanent, it does not appear that the nuisance created thereby may not at any time be abated by the defendant or by the court." * * *.' "

■ Moreover, if the Krieners were compelled to institute actions from time to time for odor related damages the burden thus imposed would be so onerous as to deny them adequate relief. See City of

Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. at 339–340, 53 S.Ct. at 604; McClintock on Equity, § 14 at 30 (2d ed. 1948); 58 Am.Jur.2d, Nuisances, § 116; 66 C.J.S. Nuisances § 171.

XXI. By reason of the above pronouncement in Ryan v. City of Emmetsburg it is of little or no consequence whether defendant's sewage lagoon be determined a temporary or permanent nuisance.

It may well be this odor related nuisance has been eliminated or is removable by enlargement, chlorination, aeration or other adequate scientific means. But we are in no position to resolve that question with any degree of certainty upon the record before us.

Therefore on remand of this case, trial court shall take further evidence to determine whether the aforesaid nuisance has been abated; if so when such was effectuated; and ascertain appropriate damages to be accordingly awarded plaintiffs in addition to those above specified, for the period from time of trial to time of such abatement.

But if trial court, upon such further hearing, finds and concludes the aforesaid nuisance cannot or will not be abated, then such injunctive relief as is appropriate shall be granted plaintiffs.

In support of the foregoing see generally City of Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. at 341, 53 S.Ct. at 605; Mahlstadt v. City of Indianola, 251 Iowa 222, 232, 100 N.W.2d 189 (1959); Amdor v. Cooney, 241 Iowa 777, 785, 43 N.W.2d 136 (1950); Stovern v. Town of Calmar, 204 Iowa 983, 986, 216 N.W. 112 (1927); Valentine v. Widman, 156 Iowa 172, 179–180, 135 N.W. 599 (1912); Costas v. City of Fond du Lac, 129 N.W.2d at 222; 58 Am.Jur.2d, Nuisances, §§ 177–179; 66 C.J. S. Nuisances §§ 129, 134; 57 Iowa L.Rev. at 476.

XXII. Next to be considered is the claim made on appeal to the effect trial court erred in finding defendant school district's sewage lagoon was not a proximate cause of plaintiffs' herd mastitis and related problems.

In that regard plaintiffs contend consumption by their cattle of creek water contaminated by lagoon derivative pseudomonas aeruginosa led to the losses upon which their instantly involved cause of action is predicated.

Here again proof as to proximate cause, considered above, becomes an important factor.

More specifically, plaintiffs were required, as a necessary element of their case, to prove the aforesaid herd affliction difficulties proximately resulted from their cattle drinking creek water polluted with organisms emitted from the school district lagoon.

■ The record in this case discloses there are multiple types of pseudomonas and of these the only mastitis causing strain is identified as pseudomonas aeruginosa. With reference thereto there is no testimony before us which reveals that pseudomonas aeruginosa was ever found in the creek water. In fact one witness, a State Health Department inspector, took several test samples of the creek water and found no such organism in any of those samplings. At best there is a showing to the effect that on one occasion only pseudomonas aeruginosa was found, and then in the lagoon effluent alone.

Moreover, expert testimony introduced in this case discloses there are many causes of mastitis and we find an absence of satisfactory evidence connecting plaintiffs' herd affliction with pseudomonas aeruginosa.

Briefly stated, our review of the record fails to disclose any persuasive testimony,

expert or otherwise, from which it can be fairly said the lagoon effluent so contaminated the creek water as to cause plaintiffs' cattle problems. In short it gives rise to nothing more than speculation, surmise and conjecture in that direction. See Stockdale v. Agrico Chemical Co., Div. of Con. Oil Co., 340 F.Supp. at 255–256, quoting Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 947–948, 219 N.W. 40 (1928).

We now find and hold, plaintiffs failed to establish a proximate causal relationship between maintenance of the sewage lagoon and plaintiffs' herd mastitis and other related problems. See Iowa R.Civ.P. 344(f)(10).

Therefore, as to this element of the case, trial court's findings and conclusions must stand.

Affirmed in part, reversed in part and remanded with instructions.