Frances RECTOR, Appellee,

v.

B. G. ALCORN and Vera Alcorn,
Appellants.

No. 2–57354.

Supreme Court of Iowa.

April 14, 1976.

Mossman & Grote, Vinton, for appellants.

John W. Tobin of Tobin, Bordewick, Fischer & Fischer, Vinton, for appellee.

Heard by REYNOLDSON, Acting C. J., and RAWLINGS, LeGRAND, UHLEN-HOPP and McCORMICK, JJ.

RAWLINGS, Justice.

Defendants appeal from trial court's adjudication enjoining forfeiture of a real estate contract. We affirm.

January 28, 1972, defendants (vendors) and plaintiff (vendee) entered into a real estate contract whereby the latter agreed to purchase from the former a commercial building in downtown Vinton. At all times here relevant, the building was leased from vendors by J. C. Penney Company for use as a retail outlet.

The involved instrument, with certain modifications, is an Iowa State Bar Association Land Contract (Official Form No. 20). After a down payment of $3000, the remaining $57,000 was payable as provided by paragraph 3 of the contract, which states:

"BALANCE OF PURCHASE PRICE. The balance of the purchase price shall be payable to Sellers, in cash, as follows, to-wit:

"1) $2,000.00 in cash on or before March 1, 1972.

"2) Seller shall execute a promissory note in favor of buyer in the sum $5,000.00 with interest at 6% per annum, payable annually. Upon payment of the balance of the selling price, $55,000.00, interest on said note shall be paid to date and the principal of the note shall stand cancelled.

(The purpose of this provision is that seller shall be receiving rental to settlement date and therefore buyer should receive interest on her down payment during the same period).

"3) Seller will accept any payment over $3,000.00 at anytime between March 1, 1972 and June 1, 1975.

"4) Balance of contract due and payable on June 1, 1975."

Vendors were permitted to remain in possession until the "settlement date", June 1, 1975, or until vendee tendered full payment of the balance, whichever first occurred.

Paragraph 9 provides:

"STATUS QUO MAINTAINED. Sellers agree that the subject matter of this sale, as now existing, and in its present condition (or better, if herein agreed) will be preserved and delivered intact at the time of settlement. However, in case of loss or destruction of part or all of such subject matter from causes covered by the insurance thereon, Buyers agree to accept such insurance recovery (proceeds to be applied as the interests of the parties appear) in lieu of the damaged or destroyed improvements and Seller shall not be required to repair or replace same. Buyers shall thereupon complete the contract and accept the property."

The contract further states, in paragraph 27:

"Normal upkeep not exceeding $600.00 annually shall be paid by seller during the pendency of this contract. All upkeep over $600.00 annually shall be paid for by buyer."

In January 1973, a year after execution of the contract, the Penney store manager (vendors' tenant) notified the parties a section of the building rear wall had "bowed out" and pulled away from the interior floor and partitions.

Vendee's husband then arranged for a masonry contractor, Carl Wells, to inspect the wall. Wells concluded the bulging section should be removed completely and rebuilt from the footings up, at an estimated cost of $6190.

Meanwhile, vendors engaged another contractor, Youngblut Construction Company, to replace the defective wall. Although vendee approved the reconstruction, she disclaimed responsibility for its cost.

The Youngblut work consisted of removing the "bowed" (east) section of the north wall, pouring concrete footings, and replacing the former brick wall with new concrete block from base to roof. In addition, however, new footings were placed on the *west* half of the rear wall, where there had been no structural "bowing". The first floor wall on this half was replaced with concrete block. A new concrete slab loading dock was also installed, with metal frame and door added to provide access from dock to building. Finally, a new concrete block storage room, 6' x 10', was constructed, and wall paneling installed in the second floor offices.

Vendee does not claim the $6,214.74 charge for Youngblut's work was excessive. Rather, she denies liability for any of this cost, particularly the latter additions and improvements which, she contends, in no event qualify as "upkeep" or costs of "repair".

After paying Youngblut in full, vendors unsuccessfully demanded reimbursement from vendee. Vendors thereupon served notice of forfeiture, supportively alleging vendee's breach of contract paragraph 27, quoted *supra*. Vendee then brought this equitable action to enjoin forfeiture, denying vendors' allegation of contractual breach. By cross-petition, vendors allege vendee consented to performance of the Youngblut work and its cost, seeking judgment for $5,728.46—total cost of all 1973 repairs, less vendors' contractual liability of $600 per annum for "upkeep".

Trial resulted in this finding of fact:

"THE COURT FINDS that the replacing of the entire north wall with new footings is not normal upkeep, and further finds that a new concrete slab at [the] loading dock and new concrete block storage room * * * is not normal upkeep. The Court further finds that the [vendee] is obligated to pay to the [ven-

dors] normal upkeep in excess of the sum of $600.00 annually."

Consequently, vendee was held not liable for any part of the wall reconstruction or improvement cost. On vendors' cross-petition, however, trial court found there had been upkeep expenditures of $805.58. Thereupon, vendors were awarded this sum, less their $600 liability assumed under paragraph 27, or $205.58. Subject to satisfaction of that judgment, trial court enjoined forfeiture of the contract.

By motion for new trial vendors claimed trial court's construction of paragraph 27 "rewrote" the agreement. In overruling this motion, the court below explained:

"The crux of the [vendors'] motion is their contention that the Court inserted the word 'normal' immediately preceding the word upkeep in the second sentence of [paragraph 27] and in effect rewrote the terms of the contract for the parties.

"While the findings of the Court included a finding that the replacing of the entire north wall with new footings is not normal upkeep * * *, the Court construed the contract to mean that paragraph 27 referred to the same upkeep in both sentences."

Vendors' sole contention on appeal is that trial court erred in adding the word "normal" to the second sentence of paragraph 27. As so phrased it would read: "Normal upkeep not exceeding $600.00 annually shall be paid by seller during the pendency of this contract. All *normal* upkeep over $600.00 annually shall be paid for by buyer." The ultimate issue posed is whether this construction is correct. Resolution of the question depends upon a number of subsidiary matters, hereafter discussed separately.

■ I. A preliminary dispute focuses upon our scope of review. Vendee maintains "the case was tried to the Court upon [vendors'] Cross-petition, a law action for money judgment". It is therefore argued, appellate review is restricted to correction of errors at law, although she has no objection to de novo review.

On the other hand, vendors correctly insist trial court simultaneously adjudicated both their cross-petition (at law) and vendee's equitable action to enjoin forfeiture. While the ultimate issue was construction of the contract—generally treated as a question of law, see *Atlantic Veneer Corporation v. Sears*, 232 N.W.2d 499, 502 (Iowa 1975)—it still remains vendee's petition to enjoin forfeiture invoked trial court's equitable jurisdiction. We are therefore guided by this statement from *Grandon v. Ellingson*, 259 Iowa 514, 518, 144 N.W.2d 898, 901 (1966):

"It is conceded the allegations of plaintiff's petition called for equitable jurisdiction. ' * * * once equity has obtained jurisdiction of a controversy, it will determine all questions material or necessary to accomplish full and complete justice between the parties, even though in doing so it may be required to pass upon some matters ordinarily cognizable at law.' [Citation]."

See also *Kriener v. Turkey Valley Community School Dist.*, 212 N.W.2d 526, 530 (Iowa 1973); *Brammer v. Allied Mutual Insurance Company*, 182 N.W.2d 169, 172 (Iowa 1970); cf. *Atlantic Veneer Corporation v. Sears, supra*; *Braverman v. Eicher*, 238 N.W.2d 331, 334 (Iowa 1976).

■ Because the case stands in equity, our review is de novo. We accordingly give weight to, but are not bound by, trial court's findings. See Iowa R.Civ.P. 334, 344(f)(7).

II. Additionally, segregation of issues which this case posits from those *not* involved is essential.

Our independent review of the record establishes cause of the problem at hand is not attributable to fault or negligence by either vendors or vendee. Rather, as trial court found, the limestone foundation and mortar of this relatively old building had deteriorated with age, and no footings remained beneath the defective wall section. Moreover, the evidence indicates deterioration occurred gradually, over many years antedating execution of the contract, but

not until 1973 did symptoms of the problem become observable.

■ The pleadings below raise various theories seeking to impose or deny liability for the wall rebuilding expense, including "caveat emptor", implied warranty, misrepresentation, and failure by prudent inspection to discover apparent defects. See generally 92 C.J.S. Vendor & Purchaser § 578; 77 Am.Jur.2d, Vendor and Purchaser, § 329, et seq. Trial court's findings are, however, restricted to construction of paragraphs 9 and 27 of the contract, both quoted above. No specific findings of fact were made as to other theories of liability. Furthermore, since vendors neither requested additional findings of fact and conclusions of law, nor here assign as error trial court's exclusive reliance on *contractual* liability, the aforesaid additional theories are deemed abandoned. As aptly stated in *Richardson v. Neppl*, 182 N.W.2d 384, 390 (Iowa 1970):

"A proposition neither assigned nor argued presents no question and need not be considered by us on review. [Citation]. Although the scope of review by this court of a case tried and determined by the trial court as an action in equity contemplates a review of the entire case, such review would be confined to those propositions relied on by each party for reversal or affirmance. [Citation]. Errors or propositions not assigned will not be considered on appeal, and this rule applies to propositions in equity cases and to errors in law actions. [Citation]."

III. Thus limited, the question now before us goes to allocation of the loss risk during the executory period of the contract, i. e., after execution but before transfer of possession. More specifically, we are called upon to determine liability for said risk of loss under the contract.

■ In *O'Brien v. Paulsen*, 192 Iowa 1351, 186 N.W. 440 (1922), this court adopted the "majority rule" for assigning loss risk in such cases. Briefly stated, upon execution of the contract of sale the purchaser becomes equitable owner of the premises, and the vendor continues to hold legal title merely as security for payment of the purchase price. See also *Beaver v. Ross*, 140 Iowa 154, 118 N.W. 287 (1908). Thus, *absent agreement to the contrary*, the equitable conversion doctrine places risk of improvements loss upon the purchaser during the executory phase of the contract, notwithstanding the fact the vendor remains in possession, if the property is destroyed or otherwise depreciated in value without fault of either party. As stated in *Ambrose v. Harrison Mutual Insurance Association*, 206 N.W.2d 683, 685 (Iowa 1973):

"[B]oth vendor and vendee under a contract of sale by which the equitable title passes to vendee have an insurable interest in the property. Depreciation in value, by reason of fire which consumes any structures or other involved property thereon, must be borne by vendee."

See also *Brady v. Welsh*, 200 Iowa 44, 46, 204 N.W. 235, 236 (1925) ("Depreciation in the value thereof, whether by reason of fire which consumes the buildings or by other causes, must be borne by the vendee; likewise any appreciation in value of the property belongs to him."). See generally 77 Am.Jur.2d, Vendor and Purchaser, §§ 363–369; 92 C.J.S. Vendor & Purchaser §§ 294–295; Annot., 27 A.L.R.2d 444 (1953).

■ But risk of loss may be otherwise allocated, by express or implied terms of a sale contract. In *Rhomberg v. Zapf*, 201 Iowa 928, 208 N.W. 276, 46 A.L.R. 1124 (1926), the vendor sold his restaurant to the vendee, but the premises were destroyed by fire approximately three weeks before delivery of possession. The contract provided, in relevant part, "all buildings to be delivered to said second party in as good condition as they are in at date of this contract, usual wear excepted." Holding for the vendee, the opinion concludes, 201 Iowa at 930, 208 N.W. at 277:

"Authorities are not numerous on the point; but, so far as we are advised, the holding is unanimous that, notwithstanding [the fact that] the equitable title had passed to the vendee, it is subject to a provision in the contract obligating the vendor to deliver the premises in good condition. [Citations]."

"The covenant to deliver the building in as good condition as it was on the date of the contract, usual wear alone excepted, was broken and performance thereof rendered impossible, by its destruction by fire prior to the date agreed upon for the final delivery of possession or the tender of the deed and abstract. In such case, the loss must be borne by [vendor]."

See also 77 Am.Jur.2d, Vendor and Purchaser, § 363; 92 C.J.S. Vendor & Purchaser § 295b(2), at 176–177; 27 A.L.R.2d, § 5, at 459–460.

■ In the case at bar paragraph 9 of the contract, quoted above, obligated vendors to deliver the building "as now existing, and in its present condition" intact on the settlement date. We are persuaded this provision placed executory risk of loss upon vendors.

■ IV. The sole remaining issue is whether paragraph 27 of the contract limits vendors' liability to the specified sum of $600 per annum.

They apparently concede the wall reconstruction was not "normal upkeep" within the meaning of the *first* sentence of paragraph 27. Relying, however, on the *second* sentence thereof vendors contend Youngblut's work qualifies as "upkeep", although not "normal upkeep". In support of this contention reference is made to testimony by Mr. Rector, vendee's husband and negotiating agent:

"Q. In your conversation, was the subject of the upkeep and repair of the building discussed? A. I asked [Mr. Alcorn (vendor)]—I said, 'What is the condition of the roof?' And he said, 'The portion of the roof is new or practically new but the other is not good and I am sure we will have to put on a new roof before the term of our contract' but he said, 'I will pay $600 and you pay all the rest of it because you will have improvements and betterments for the duration of the length of the time that the roof should last,' and that I thought was very fair."

Briefly stated, vendors contend each sentence of paragraph 27 expresses a different agreement. The first obligates them to pay up to $600 "normal" upkeep per annum. The second requires vendee to pay *all* upkeep, normal or otherwise, over $600 annually. Moreover, because Mr. Alcorn's own testimony indicates *replacement* of the defective roof section was encompassed by the word "upkeep", we are told *replacement* of the defective wall section was likewise contemplated.

Vendee takes the position paragraph 27 was intended to deal only with the roof. In this regard trial court found:

"During the negotiations, the defendant, B. G. Alcorn told plaintiff's husband that a portion of the roof was in bad shape and would need repairing or replacing before the final closing date on June 1, 1975. There was no discussion between them about any other problems; nor, apparently, did they contemplate the contingency which gave rise to this action."

In short, vendee maintains paragraph 27 is expressive of one idea rather than two—i. e., vendors pay up to $600 annual upkeep, and vendee the excess. Mr. Alcorn's testimony lends support to this theory:

"[O]ur agreement according to the writing and the way I understood it, that I was to pay the first $600 in any one year and he [Rector] was to pay—his wife was to pay all of the upkeep over that, * * *. My understanding was that I was to pay the first $600 and any repair that was over that, that they had to pay."

Noticeably, the foregoing draws no distinction between "normal" upkeep and all other upkeep. Rather, it tends to confirm trial court's construction of the contract "to mean that paragraph 27 referred to the same upkeep in both sentences."

There is evidentiary support for the views advanced by both parties. According due weight to trial court's findings, we are persuaded, however, paragraph 27 contemplated no distinction between "normal upkeep", in the first sentence, and "all upkeep" in the second.

V. The final step of our inquiry is to determine whether the wall reconstruction

was "upkeep" within the meaning of paragraph 27.

"Upkeep", in the sense employed here, means "cost of maintaining in good condition or supporting * * *." See Webster's Third New International Dictionary, at 2517 (1961). The term has also been defined as "the act of keeping up or maintaining; maintenance, *repair*." See Black's Law Dictionary, at 1709 (rev. 4th ed. 1968), citing *Central Hanover Bank & Trust Co. v. Nisbet,* 121 Conn. 682, 186 A. 643, 645 (1936). By virtue of the fact both parties hereto use the words "upkeep" and "repair" interchangeably, we are justified in doing likewise.

Even so, resolution of the instant question does not require reliance upon the distinction between "repair", on one hand, and "alteration" or "reconstruction" on the other. See *Stowe v. Wood,* 199 N.W.2d 323, 326–327 (Iowa 1972), and citations; *Clark v. Martin,* 182 Iowa 811, 815, 166 N.W. 276 (1918); *Woodbury Company v. Tackaberry Co.,* 166 Iowa 642, 646, 148 N.W. 639 (1914); *Farraher v. City of Keokuk,* 111 Iowa 310, 313–314, 82 N.W. 773 (1900). See also *Hampers v. Darling,* 194 Pa.Super. 59, 166 A.2d 308, 310 (1960). Rather, recourse to settled rules of contract law settles the problem.

■ "The question of *interpretation,* i. e., the meaning to be given contractual words, is one to be determined by the court unless the interpretation depends on extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *C & J Fert., Inc. v. Allied Mut. Ins. Co.,* 227 N.W.2d 169, 172 (Iowa 1975). See also *Connie's Const. v. Fireman's Fund Ins.,* 227 N.W.2d 207, 210 (Iowa 1975). And, as stated in *Brammer v. Allied Mutual Insurance Company,* 182 N.W.2d at 172:

"If the evidence is so clear that a reasonable man could reach but one conclusion the question should be determined by the court as a matter of law. But if the evidence is disputed or if different conclusions may be drawn from the evidence, the question of interpretation is one of fact * * *. [Citation].

"In *Morris Plan Leasing Co. v. Bingham Feed & Grain Co.,* (1966) 259 Iowa 404, 143 N.W.2d 404, 412, we said:

"'Ambiguity may be said to appear when, after the application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty results as to which one of two or more meanings is the proper one. [Citations]. * * *.'"

■ We are satisfied the word "upkeep" is ambiguous as it relates to rebuilding the defective wall section. Trial court found, and vendors do not dispute, the cost thereof was not "normal upkeep" within the meaning of the first sentence of paragraph 27. And, although the testimony is conflicting, on balance we find vendors' contention that the second sentence refers to all other upkeep expenditures, normal or abnormal, in excess of $600 per year, is not sufficiently established by the record. We therefore conclude the wall reconstruction expense was not within the ambit of either sentence of paragraph 27.

Consequently, having determined paragraph 9 shifted the executory risk of loss to vendors, it follows they are responsible for the entire $6,214.74 reconstruction cost.

■ This conclusion is supported by the fact the word "upkeep" was chosen by vendors' attorney. It is well settled, "doubtful language in a written instrument is construed against the party who selected it". See *Pappas v. Bever,* 219 N.W.2d 720, 722 (Iowa 1974). See also *Webb v. Lake Mills Community School District,* 344 F.Supp. 791, 800–801 (N.D.Iowa 1972).

Trial court reached the right result.

AFFIRMED.