# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1074
Filed May 13, 2026

———————————

**Tracy Barkalow,**
Plaintiff–Appellant,

v.

**Jeffrey Clark, Bryan Clark, Joseph Clark and Outside Properties, LLC,**
Defendants–Appellees.

———————————

Appeal from the Iowa District Court for Johnson County,
The Honorable John Telleen, Judge.

———————————

**AFFIRMED AND REMANDED**

———————————

William W. Graham (argued), Wesley T. Graham, and Tanner J. Berger of
Duncan Green, P.C., Des Moines, attorneys for appellant.

Kevin J. Caster (argued), Jackson C. Blais, Laurie L. Dawley, and Kate E.
Thorne Jewell of Shuttleworth & Ingersoll, PLC, Cedar Rapids, attorneys
for appellees.

———————————

Heard at oral argument
by Tabor, C.J., Sandy, J., and Doyle, S.J.
Telleen, S.J., takes no part.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

Tracy Barkalow and his brothers-in-law—Jeffrey, Bryan, and Joseph Clark—continue to tussle over their limited liability company, Outside Properties, LLC.[1] In 2019, the district court ordered the company dissolved and the capital contributions of each member reclassified as debt. *Barkalow v. Clark*, 959 N.W.2d 410, 417 (Iowa 2021). The supreme court reversed those orders and remanded with instructions for the members to continue operating Outside Properties. *Id.* at 422–23.

A year later, Barkalow petitioned for declaratory judgment, seeking to judicially dissolve the company. In November 2024, the four owners agreed to judicial dissolution of Outside Properties. The district court held a bench trial on stipulated facts and exhibits to determine how the company's remaining assets should be distributed.

The issue before us is whether Outside Properties' surplus assets should be distributed *per capital* (based on the owners' financial contributions to the company) or *per capita* (equally between the owners). The district court found the operating agreement called for *per capital* distributions. Barkalow contends the operating agreement was silent on the method of distribution, so the surplus should be divided in equal shares under the "default rule" in Iowa Code chapter 489 (2022). He argues the district court wrongly relied on documents outside the company's operating agreement to reach its contrary conclusion.

---

[1] In the district court, Joseph sided with Barkalow. But he did not file a notice of appeal, so the supreme court disallowed his joinder motion. We refer to the brothers individually as needed or all three collectively as the Clarks, as determined by context.

On our de novo review, we find the operating agreement for Outside Properties included not only the four-page document entitled Operating Agreement, but also the Management Certificates, the Certificate of Organization, and the Minutes of the Organizational Meeting—all signed in August 2009. Read together, those four documents adopt a *per capital* distribution plan for the operation of the company. And as the district court determined, that same plan applied to distribution of the company's surplus at the time of dissolution. Thus, we affirm.

## I.     Facts and Prior Proceedings

Barkalow and the Clark brothers operated Outside Properties as a real estate investment for over fifteen years. It started when they bought property on Melrose Avenue in Iowa City, hoping to capitalize on the market for rentals close to Kinnick Stadium. *See Barkalow*, 959 N.W.2d at 412–13. They formed the business as a limited liability company (LLC) with each member expected to contribute $41,000 as the first capital investment. *Id.* at 413 (noting that amount covered a $37,500 down payment plus an initial installment). Barkalow couldn't come up with the cash, so the Clarks offered a loan, which he repaid. *Id.*

On August 25, 2009, Barkalow and the Clarks launched the LLC by signing the Minutes of Organizational Meeting. At that meeting, they decided that Barkalow would be "primarily responsible for the business" of the company. The same day, they each signed Management Certificates declaring their equal contributions "representing a 25% ownership interest" for each contributor. Those certificates stated: "capital contribution and proportionate equity interest is subject to change and is reflected in the books and records of the company."

While labeled Management Certificates, other provisions called the documents Certificates of Ownership. Those certificates listed several restrictions. For example, they gave the company and then current members the first right to acquire additional equity by transfer, and they required remaining members to agree before a transferee could participate in the management of the business. If the members did not agree, the transferee would "only be entitled to receive the share of the profit or other compensation by way of income and the return of contributions" to which the departing member would have been entitled.

Less than a week later, the four owners signed a document entitled Operating Agreement. Explaining the powers of the members, the agreement provided that formal action of the LLC required a majority vote of a quorum of members. It defined a quorum as "a majority of the equity interests, as determined by the capital contribution of each member as reflected on the books of the company." The article of the agreement governing distribution of profits stated:

> The members may from time to time unanimously declare, and the company may distribute, accumulated profits that the members agree are not necessary for the cash needs of the company's business. Unless otherwise provided, retained profits shall be deemed an increase in the capital of the company.

But the agreement did not specify the method of distributing profits, and Outside Properties never made any distributions to its members.

As the final act to create the LLC, Barkalow and the Clarks filed a Certificate of Organization with the State of Iowa in October 2009.[2] It

---

[2] The October filing was the second draft. Barkalow and the Clarks also prepared and signed a draft on August 25, alongside the Management Certificates and Meeting Minutes. After they signed the Operating Agreement, their attorney suggested edits,

specified that they each chipped in $41,000 and that "no additional capital contributions" would be required. Additional provisions noted that new members would be admitted only by the unanimous consent of the existing members. On a member's "death, retirement, resignation, expulsion, [or] bankruptcy" or the dissolution or termination of a membership, the remaining members could continue operating the business. In that event, the certificate provided that

> [t]he return of capital and the distribution of profits shall be determined from the company's books, as of the effective date of withdrawal, based on generally accepted accounting practices, and paid as soon as practicable without diminishing the prospects of the company's ventures and subject to the limitations of . . . chapter 489 of the Code of Iowa, as amended.

The certificate did not specify what sections of chapter 489 were relevant. As far as daily operations, the certificate left it to the members or their designees to determine "in the manner described in the company's operating agreement."

For several years, Barkalow and the Clarks split duties related to Outside Properties, on top of running their individual companies. *See generally id.* at 412–17. In 2010, they agreed to amend the Operating Agreement to create class "B" non-voting interests, and each owner gave shares to their family members. The four original owners remained the only voting members.

---

commenting, "Some of the issues that I have raised in this letter are addressed by statute, although I think that it is generally better to spell them out specifically if they are of significant importance." The filed Certificate of Organization incorporated a few of the attorney's minor edits but none of the substantive ones. Of relevance, the attorney noted, "There is no provision for adjustment of Capital Accounts on a periodic basis for additional capital contributions and withdrawals." He also suggested a provision to clarify the adjustment of voting rights with capital account ratios.

Also in 2010, the company acquired several other properties near Kinnick Stadium. *See id.* at 413. The Clarks provided a loan for the down payment from their family company, and the seller provided financing of around $1 million with a balloon payment due in December 2015. *Id.*

Around 2013, Barkalow's relationship with Jeff and Bryan began to fray. *See id.* at 414. In 2015, when the balloon payment came due, Barkalow wouldn't help the Clarks address it. *Id.* So Bryan, Jeff, and Joseph agreed to make capital contributions to Outside Properties to cover the payment. *Id.* Barkalow again declined to contribute. *Id.* But the Clarks each invested $333,956.62 more in capital. *Id.*

In early 2016, the Clarks proposed several solutions to ease the tensions in the company, including offering to buy out Barkalow's share, using third-party financing to cover loans, and contributing more capital. Barkalow rejected these offers. Later that year, the Clarks voted to repay their own company's loan to Outside Properties. *Id.* at 415. When Joseph backed out of that agreement, Jeff and Bryan split his share, making additional contributions totaling $474,999 each.

By summer 2017, the situation escalated into litigation. Barkalow sued the Clarks—seeking to remove them as members, to dissolve the company, and to obtain a damage award. *Id.* The Clarks counterclaimed, asserting Barkalow had transferred money from Outside Properties to his own ventures. After a five-day bench trial, the district court denied Barkalow's claims and found he had improperly converted assets from Outside Properties. It also ordered the judicial dissolution of the company. In doing so, it reclassified the capital contributions that the Clarks made in 2015 and 2016 as company debt. *Id.* at 417–18.

In its May 2021 decision, the supreme court affirmed the conversion rulings but reversed the dissolution and reclassification orders, finding the situation did not meet the stringent standard for judicially dissolving the company. *Id.* at 423 ("Dissolution under Iowa Code section 489.701(d)(2) is not a wide-ranging mechanism for doing equity, but a drastic remedy to be ordered when an LLC is truly in an unmovable logjam or cannot as a practical matter carry on its contracted purpose. Neither circumstance is present here.").

Barkalow filed this action in October 2022 seeking declaratory and injunctive relief and to dissolve the company and appoint a receiver. He argued that, after the return of each member's individual capital contributions, the surplus assets of Outside Properties should be distributed in equal shares among the members, according to the default statutes. In February 2024, on the Clarks' motion, the court granted partial summary judgment, finding Barklow was "precluded from relitigating issues decided" in the first appeal.[3] Before trial, they stipulated to the judicial dissolution of the company.

The district court held a bench trial on stipulated facts, exhibits, and briefs, deciding only how the surplus assets should be distributed. At trial, Joseph joined in Barkalow's cause, advocating for an equal four-way split. But the court ruled that the assets should be distributed according to the owners' capital contributions based on its interpretation of the Operating Agreement,

---

[3] Two months later, the parties transferred the case to the Iowa Business Court, sitting in Johnson County.

the Management Certificates, the Certificate of Organization, as well as the 2010 amendment to the Operating Agreement.[4]

Barkalow appeals.

## II.    Scope and Standard of Review

Because the declaratory judgment action was equitable in nature, our review is de novo. *Barkalow*, 959 N.W.2d at 418 ("Judicial dissolution is an equitable proceeding and our review is de novo."). Although interpretations of contracts and statutes would typically be reviewed for errors at law, here they fall under the de novo umbrella. *See Rector v. Alcorn*, 241 N.W.2d 196, 199 (Iowa 1976) ("[O]nce equity has obtained jurisdiction of a controversy, it will determine all questions material or necessary to accomplish full and complete justice between the parties, even though in doing so it may be required to pass upon some matters ordinarily cognizable at law." (citation omitted)). In equity cases, we give weight to the district court's factual findings, but we are not bound by them. *Iowa N. Ry. Co. v. Floyd Cnty. Bd. of Supervisors*, 29 N.W.3d 307, 311–12 (Iowa 2025).

## III.    Analysis

Barkalow contends that after its dissolution, Outside Properties' surplus assets should be distributed based on the number of owners, not on the proportion of their contributions to the company's capital. He insists that because the company's operating agreement is silent on the manner of distribution, the method prescribed by Iowa Code chapter 489 controls. *See* Iowa Code § 489.110(2) (2009) (explaining that when the operating

---

[4] Barkalow moved to reconsider. The court did adjust its recitation of Barkalow's position at trial. But that adjustment was immaterial to its findings, so the court denied his request to change any legal conclusions.

agreement does not otherwise provide for a matter, chapter 489 governs).[5] That chapter provides that, after the payment of debts and the return of the individual members' capital contributions, the surplus assets are to be distributed "[i]n equal shares" to the members of the limited liability company. Iowa Code § 489.708(2)(a), (b).[6]

Iowa adopted the Revised Uniform Limited Liability Company Act (RULLCA) in 2008. *See* 2008 Iowa Acts ch. 1162 (codified at Iowa Code chapter 489). Under that act, the governance of an LLC is typically "controlled by an operating agreement agreed to by the members." *Hunter Three Farms, LLC v. Hunter*, 18 N.W.3d 1, 6 (Iowa 2025) (quoting Iowa Code §§ 489.104(1), .105(1)). "If the company has an operating agreement, it is binding." *Id.*; *see also Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) ("Iowa law dictates that an LLC is bound by its operating agreement.").

---

[5] The code lists these matters within the scope of an operating agreement:

> a. Relations among the members as members and between the members and the limited liability company.

> b. The rights and duties under this chapter of a person in the capacity of manager.

> c. The activities of the company and the conduct of those activities.

> d. The means and conditions for amending the operating agreement.

Iowa Code § 489.110(1).

[6] Our record does not include the books of the company, so we don't know whether there will be surplus assets to distribute. If an LLC lacks "sufficient surplus to comply" with section 489.708(2), "any surplus must be distributed . . . in proportion to the value of [the members'] respective unreturned contributions." Iowa Code § 489.708(3).

To address Barkalow's claim, we must examine Outside Properties' operating agreement. To begin, the parties dispute which documents comprise that agreement. Barkalow takes a narrow view. He argues that the search for the proper method of distribution must begin and end with the document labeled "Operating Agreement," which the four owners signed on August 31, 2009. According to Barkalow, nothing in the Minutes of Organizational Meeting of the Members of Outside Properties (signed August 25), the Management Certificates (signed August 25), or the Certificate of Organization (signed August 25, amended and filed October 2) refers to operational agreements. In short, Barkalow asserts: "there is only one document comprising the Operating Agreement of Outside Properties." Jeff and Bryan disagree. They characterize Barkalow's interpretation as "myopic" and maintain that the company's operating agreement was broader than one document.

To settle the parties' debate, we start with the statutory definition of "operating agreement" included in the chapter governing LLCs:

> the agreement, whether or not referred to as an operating agreement and whether oral, in a record, implied, or in any combination thereof, of all the members of a limited liability company, including a sole member, concerning the matters described in section 489.110, subsection 1. The term includes the agreement as amended or restated.

Iowa Code § 489.102(15). This definition embraces a broad range of communications any of which or "any combination thereof" can comprise an operating agreement "whether or not referred to" with that label. *Id.*; *see also* Revised Unif. Ltd. Liab. Co. Act § 102 cmt (Unif. L. Comm'n 2006) ("The definition in Paragraph 13 is very broad and recognizes a wide scope of authority for the operating agreement . . . . Moreover, the definition puts no limits on the form of the operating agreement.").

The breadth of the RULLCA's definition supports Jeff and Bryan's position. Barkalow's exclusive focus on the four-page Operating Agreement is too constricted where other communications reveal insights into matters governed by an operating agreement. We conclude that the intent of the operating agreement reached by the members of Outside Properties can be discerned from the combination of the Operating Agreement, the Management Certifications, and the Certificate of Organization, as well as the meeting minutes from August 2009.[7]

Resisting that conclusion, Barkalow points out that neither the meeting minutes nor the Operating Agreement mention "any extraneous documents" being incorporated into the agreement. But the lack of incorporation does not dissuade us from reviewing these founding documents in tandem. We may do so because nothing in the Operating Agreement says that the members intended it to stand as the exclusive summary of their agreement on how to conduct the activities of the company. What's more, there are cross references. For example, the Management Certificates refer to the Certificate of Organization and "all Operating Agreements as may be in force"; and the minutes name Barkalow as the business's manager whose rights and duties are enumerated in the Operating Agreement.

As for timing, the proximity of signing all four documents shows the members intended the combined provisions to constitute the operating agreement for Outside Properties. *See Taylor Enter., Inc. v. Clarinda Prod.*

---

[7] The district court analyzed the Operating Agreement separately but noted when discussing the other documents that the Operating Agreement's lack of an integration clause meant that the court could consider extrinsic evidence, citing *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 729 (Iowa 2014). While we take a different route than the district court, we reach the same destination.

*Credit Ass'n*, 447 N.W.2d 113, 115 (Iowa 1989) ("Instruments relating to the same transaction which are contemporaneously executed should be construed together."). Thus, we construe the parties' intent from the whole agreement as it existed at the formation of the LLC. *See Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). The matters discussed in those documents make up the operating agreement for Outside Properties in 2009.

So what does that operating agreement say about how the company should distribute any surplus assets as it winds up its business? Because the operating agreement is a contract, we turn to the principles of contract interpretation. *See* Revised Unif. Ltd. Liab. Co. Act § 102 cmt. We apply those principles to determine the intent of the parties when they entered their agreement. *Retterath*, 938 N.W.2d at 687. The language used by the parties is the most important proof of their intentions, and therefore, we strive to give effect to all provisions of the agreement. *Id.*

Barkalow argues that Outside Properties' operating agreement contains no direct expression of how assets are to be distributed at dissolution. But the district court thought otherwise. It ruled that "the Operating Agreements expressly adopt a *per capital* ownership and distribution scheme, which, in turn, requires *per capital* asset disbursement when winding up." The court discerned that intent in the Operating Agreement provisions defining a quorum as "a majority of the equity interests, as determined by the capital contribution of each member as reflected on the books of the company" and specifying that the act of a majority of the members present with a quorum "shall be the act of the members." The court also saw that intent in the provision that, "[u]pon demand of any member, voting on a particular issue shall be in proportion to the capital contributions of each member to the company, as adjusted from

time to time to reflect any additional contributions or withdrawals." As the court reasoned, these provisions tied the individual owners' "equity interests" to their "capital contribution."

And the court took insight from the Management Certificate clauses that "[t]he stated capital contribution and proportionate equity interest is subject to change," stating, "The Court interprets the 'equity interests' . . . as identical with the term 'transferable interest' in Iowa Code § 489.102." (Footnote omitted.) That section defines "transferable interest" as "the right, as initially owned by a person in the person's capacity as a member, to receive distributions from a limited liability company, whether or not the person remains a member or continues to own any part of the right." Iowa Code § 489.102(30)(a) (2024). The court concluded, "[F]rom the beginning of the LLC, the parties' right to receive distributions was proportionate to their individual capital contributions."

Finally, the court relied on the "Continuity of Life" provision in the Certificate of Organization. That paragraph discussed the right of the remaining members to continue the business when another owner's membership is terminated. In that event, "The return of capital and the distribution of profits shall be determined from the company's books . . . ."

Barkalow rejects the district court's extrapolation of the members' intent from those scattered provisions. He contends that where the Operating Agreement addresses distributions, it only empowers the members to vote for a distribution with accumulated profits, otherwise retained profits become part of the company capital. He criticizes the court's reading of the quorum rule and the rules allocating voting rights arguing, "These sections do not discuss the distribution of profits to the members."

13

But those sections—and the others highlighted by the district court—provide necessary context for the whole agreement. *See Degeneffe v. Home Pride Contractors, Inc.*, 16 N.W.3d 501, 507 (Iowa 2025) ("In interpreting contracts, we give effect to the language of the entire contract according to its commonly accepted and ordinary meaning. Moreover, particular words and phrases are not interpreted in isolation. Instead, they are interpreted in a context in which they are used." (citation omitted)). Voting rights is a good example of this context-interpretation rule. On the one hand, under the Operating Agreement, a majority of a quorum of voting members ordinarily can approve an act of the LLC. On the other hand, "[u]pon demand of any member, voting on a particular issue shall be in proportion to the capital contributions of each member to the company, as adjusted from time to time to reflect any additional contributions or withdraw[al]s." Thus, allocation of voting power *per capital* is enshrined in the Operating Agreement.

We also see the members' intent to follow a *per capital* ownership and distribution scheme from the Management Certificates. Those certificates provide that each member's "capital contribution and proportionate equity interest is subject to change and is reflected in the books and records of the company that are prepared and kept." As Jeff and Bryan contend, this language reveals that "a member's equity and interest in the company is based off of his capital contributions, which are subject to change."

Read as an integrated package, these operating agreement documents contemplate changing interests proportional to the capital contribution of the individual member. *See Barkalow*, 959 N.W.2d at 414 n.3 ("Barkalow pursued [the argument that the creation of class B stock diluted his voting power] at trial and the district court ruled against him. The district court found that under the 'demand' vote provision in the operating agreement, voting is in

14

proportion to 'capital contributions,' not units or interests. Barkalow has not appealed this issue."). These documents reflect that the members' ownership and equity interests were subject to change and were in proportion to capital contributions, even when transferred by a voting member to a non-voting member.

From the company's inception, its members acknowledged that capital contributions could potentially become unequal and accepted that voting power within the company and the right to distributions would be allocated to account for that disparity. As our bottom line, we reach the same conclusion as the district court. The documents comprising Outside Properties' operating agreement show that members intended distribution of the company's surplus assets on dissolution to be in proportion to the capital contributions—*per capital*—not equal for all members—*per capita*. Thus, we affirm the district court ruling and remand for further proceedings and appropriate orders.

**AFFIRMED AND REMANDED.**